J-E03001-17

2018 PA Super 334

| | |
|---|---|
| IN RE: K.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF K.R., BIRTH MOTHER | No. 692 WDA 2017 |

Appeal from the Order Entered April 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-222-2016

| | |
|---|---|
| IN RE: E.R., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF K.R., BIRTH MOTHER | No. 693 WDA 2017 |

Appeal from the Order Entered April 10, 2017
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-223-2016

BEFORE:   GANTMAN, P.J., BOWES, PANELLA, SHOGAN, LAZARUS, OLSON, OTT, STABILE, and DUBOW, JJ.

OPINION BY STABILE, J.:                    FILED DECEMBER 10, 2018

In these consolidated appeals we address whether the Court of Common Pleas of Allegheny County ("orphans' court"), under orders dated April 10, 2017, properly granted the petitions of Allegheny County Children, Youth and Families ("CYF") to involuntarily terminate the parental rights of Appellant, K.R. ("Mother") to her children, K.R., born in November 2010, and E.R., born

in March 2012 (the "Children"), pursuant to Sections 2511(a)(2), (5) and (8), and (b) of the Adoption Act ("Act").[1] Upon docket review, this Court ordered these matters would be considered by this Court en banc. In particular, en banc review was ordered to determine the proper application of our Supreme Court's decision in In re: Adoption of L.B.M., 161 A.3d 172 (Pa. 2017), in response to Mother's contention the orphans' court erred by failing to appoint legal counsel for the Children. Mother raised these representation issues for the first time on appeal to this Court.

Subsequent to our en banc order, our Supreme Court granted petitions for allowance of appeal in In re: T.S., 192 A.3d 1080 (Pa. 2018), to consider whether this Court erred in failing to require the orphans' court to appoint counsel for a child in a contested termination of parental rights hearing as required by 23 Pa.C.S.A. § 2313(a) and in L.B.M. On August 22, 2018, the Supreme Court issued its decision in T.S. resolving the representation issues raised. For the reasons set forth below, we now affirm the termination orders of the orphans' court, and conclude that the orphans' court did not commit a reversible error on the representation issues raised by Mother for the first time in these appeals.

The facts and procedural history underlying this case are undisputed and supported by the record. CYF initially became involved with the family in 2009 after Mother's release from Allegheny County Jail where she spent time on

_____

[1] Act of October 15, 1985, P.L. 934, as amended, 23 Pa.C.S.A. §§ 2101-2938.

various criminal charges. Mother was twenty-one years old at that time and addicted to heroin. The Children's biological father J.R. ("Father") was incarcerated. N.T. Trial, 3/24/17, at 7-8. After Mother's release, CYF received a report that the Children's older stepsibling, who is not a subject of this appeal, had a black eye and a yeast infection. CYF provided Mother in-home services, concrete goods, random urine screens, and referrals for Pennsylvania Organization for Women in Early Recovery ("POWER"), SHORES,[2] and mental health services. Id. at 8. CYF's involvement with the family lasted until February 2011.

CYF next became involved with the family on March 22, 2013 after receiving reports of drug and alcohol abuse and medical neglect of E.R. and the Children's older stepsibling. Specifically, E.R. was born with a birth defect wherein his "intestines [were] outside of his stomach[,]" resulting in the absence of a belly button. Id. at 9, 14-15. E.R. had not been receiving the necessary medical care for this condition. Id. at 9. CYF accepted the family for services, and maintained contact with the parents until June 2013. Id. From June 2013 until October 2013, and again from November 2013 until September 2014, CYF was unable to locate the family. Id. When CYF located the family, Mother informed them of their homelessness and admitted to actively abusing drugs, including heroin. Father admitted to using Suboxone, but indicated he was amenable to drug and alcohol treatment. Id. at 10.

_____

[2] SHORES is an outpatient drug and alcohol program offered through the Holy Family Institute.

Upon locating the family in September 2014, CYF maintained continuous contact with them until April 2015. During this time, CYF provided the family in-home services through Holy Family and Family Resources, transportation for the parents, concrete goods, referred them for housing assistance, DART, and Alliance for Infants. Id. at 10-11.

In April 2015, CYF attempted to obtain an emergency custody authorization ("ECA") because of "continued substance abuse," and "continued substance abuse in front of [the Children's older stepsibling]." Id. at 11. Moreover, the home "had needles present and the children were viewing substance abuse." Id. The juvenile court denied CYF's request for ECA for the Children. Id. Thereafter, CYF "continued to monitor the family," "supported [M]other to obtain another POWER assessment," and conducted frequent home visits. Id. at 11-12.

CYF's implementation of drug and alcohol treatment services was unsuccessful. In particular, CYF received reports that the Children's stepsibling was supervising them, and that the parents were abusing Suboxone without a prescription. Id. at 12-13. As a result, CYF prepared a safety plan pursuant to which the Children's maternal aunt, with whom the family was residing at the time, would support them and supervise their interaction with Mother and Father. Id. at 13. The maternal aunt, however, did not comply with the safety plan. Id. CYF "had indications that [the] parents were continuing to use substances." Id. Mother was asked to take a random urine screen, the results of which revealed that she was positive for

THC and cocaine. Id. Father refused to take the drug screen. Id. Based on the foregoing, CYF requested another ECA on June 19, 2015, which the juvenile court granted. Id. On the same date, the juvenile court issued orders appointing KidsVoice as the Children's guardian ad litem ("GAL") "to represent the legal interests and best interests of [the Children] in connection with any proceedings related to dependency, including any proceeding before a hearing officer, administrative hearings and reviews." Juvenile Court Orders, 6/19/15. At the time the Children were removed from the house and taken into custody, they were dirty, underweight and behind on their immunizations. N.T. Trial, 3/24/17, at 14. Additionally, E.R. "appeared to have a burn mark on his head." Id. The Children were placed temporarily with D.S., who was not a relative. Id.

Following a shelter hearing, the juvenile court transferred the Children's legal and physical custody to CYF and the Children remained in the care of D.S. Id. at 15-16. On June 25, 2015, CYF filed dependency petitions, which the juvenile court granted on September 23, 2015. In so doing, the juvenile court adjudicated the Children dependent because of parental drug use, medical neglect, improper supervision and housing instability. The juvenile court directed Mother to seek drug and alcohol treatment, obtain appropriate housing, and take random urine screens. The permanent placement goal for the Children was to "return to parent or guardian." Orders of Adjudication, 9/23/15.

Since April 2015, Mother has been enrolled in various maintenance programs to treat her drug addiction. From April 2015 until June 2015, Mother received treatment at Hutton Health. Id. at 26. In July 2015, Mother enrolled in a program at Turning Point to seek treatment for drug and alcohol abuse. N.T. Trial, 3/24/17, at 16-17, 26. She, however, left the program without completing it. Id. at 18. From April 2015 until March 24, 2017, Mother was scheduled for forty-one weekly random urine screens, but attended only nine. Id. at 28.

Since December 2015, Mother has attended the Alliance Medical Services Methadone maintenance program. Id. at 27, 29. In October 2016, Mother informed a CYF caseworker that "she would test positive for opiates, but that she did have a prescription." Id. at 30. In February 2017, Mother was convicted of possession of a controlled substance for an incident that occurred in September 2016. Id.

Although CYF provided Mother information for Allegheny Link, a referral to Urban League, and other assistance, she failed to obtain stable housing. Id. at 34. As of March 2017, Mother was residing with her mother. Id. CYF maintained regular contact with Mother, except for October and December 2015, when she "relapsed on heroin." Id. at 35.

Mother also had a history of mental health problems, specifically, depression and attention deficit hyperactivity disorder ("ADHD"). Id. To address the mental health concerns, Mother was referred to Mercy Behavioral Health ("Mercy"). Id. at 35-36. Mother cancelled two intake appointments

at Mercy, on August 22, 2016 and September 13, 2016. Id. at 36. She, however, enrolled at Mercy on January 2017, when she attended four sessions there. Id. Prior to treatment at Mercy, Mother received services for mental health at Staunton Clinic and Crossroads. Id. at 35-36. Additionally, in the summer of 2016, Mother was instructed to participate in a parenting program at the Three Rivers Adoption Council. Id. at 38-39. She, however, failed to complete it because she was discharged from the program, in part, because of her irregular attendance. Id. at 39, 68, 70.

Starting in April 2015, Mother was permitted to have supervised visits with the Children weekly. Id. at 41. In June 2016, Mother's visitation rights were increased to twice weekly. Id. Even though CYF provided Mother increased visitation with the Children per week, she failed to avail herself of that opportunity. Id. at 67. In fact, of the seventy scheduled visits with the Children since June 2015, Mother attended only thirty-five. Id. at 42. CYF was unaware of Mother's whereabouts from October to December 2015. Id. at 67-68. On December 6, 2016, CYF petitioned the orphans' court to terminate Mother's and Father's parental rights to the Children under Section 2511(a)(2), (5) and (8), and (b) of the Act. KidsVoice continued to represent the Children as their GAL in the termination proceedings. On March 24, 2017, the orphans' court held a hearing on CYF's involuntary termination petitions, at which CYF presented the testimony of two witnesses. CYF first called Athena Wight to the stand, who testified that CYF employed her as a

caseworker and had assigned her to the instant case. N.T. Trial, 3/24/17, at 5-6. In pertinent part, Ms. Wight testified that Mother

> has issues staying on track, following directives, maintaining appointments. She can be argumentative. She can be uncooperative. She becomes highly emotional when discussing her family plan goals, as to alleviate the circumstances of the [C]hildren's placement. She has difficulty remembering to be on time for appointments and to follow up with caseworker.

Id. at 37. Describing the Children's interaction with Mother, Ms. Wight testified that, in the summer of 2016, they would "speak to [M]other," but "often" referred to her using her first name. Id. at 43. Ms. Wight further testified that the Children "called their foster mother at that point mommy in front of [Mother]. They don't become upset when it is time to leave. Mother will prompt them to engage with her and they will, but they don't get upset when it is time to leave." Id. at 43-44.

> Describing K.R., Ms. Wight remarked:

> [K.R.] is shy and quiet sometimes. At the beginning of the case she had difficulty even speaking. She couldn't spell her own name. She displayed a lot of sexual acting out behaviors, like humping things that were inappropriate objects. She also would eat objects that weren't food. When she was fed, she would eat so much that she would get sick. Now, there hasn't been any sexual acting out behavior since her most recent placement. She grooms herself very well. She talks more. She feels comfortable to share her thoughts and feelings with her current foster parents and she doesn't fight with her brother, which was a really big issue as well.

Id. at 49. Ms. Wight testified that K.R. was enrolled at a therapeutic program for children at Matilda Theiss. Id. at 49-50. Next, describing E.R., Ms. Wight stated:

[E.R.] became really anxious. He would have a lot of stomach issues. He got a lot of motion sickness. Some of that was related to his medical issues, but it was also related to anxiety. He would refuse to get in the car for visits sometimes or just in general. He fought with his sister a lot. He would sometimes bang his head. He became angry and aggressive. Now, he does have some anger still, but he is in a place where he feels comfortable and safe. They have a plan for him in school, so that he can take breaks and relax. He also is participating in therapy with Matilda Theiss. He knows that he will be fed and clothed in the home that he is in now and that is the one thing he punctuated that he wanted to have. He is happier. He talks a whole lot more.

Id. at 50. Ms. Wight testified that the Children were with a new foster family since December 2016, even though they initially were placed with D.S. Id. at 51. The new foster family was described as "an adoptive resource." Id. Since being placed in the care of the new foster family, according to Ms. Wight,

the [C]hildren aren't fighting, which they were fighting still in the previous placement. [E.R.] was acting out. He cut the cord on the previous caregiver's alarm system. They would attempt to hit each other, knock things over, especially [E.R.]. They were having night terrors ongoing. They are not having any nighttime terrors at all. They sleep in their beds and they don't wake up. They also report to me that they enjoy the fact that the house is clean. [K.R.] most recently stated that she wants to be adopted. She said to me that she knows that she came out of [Mother's] belly, but she wishes that she came out of [foster mom's]. [E.R.] calls his foster father dad. He doesn't refer to [Father]. He hasn't spoken to me about [Father] in some time. I have spoken with the [C]hildren about what kind of home life they would like and they tell me – most notably, [K.R.] told me that she wants to be in a place where she is fed and clothed and bathed regularly. That is all occurring in that home.

Id. at 52-53. Ms. Wight opined that Mother continues to be unable to meet the essential needs of the Children. Id. at 55. Moreover, Ms. Wight also

opined that Mother is unable to remedy the conditions that "caused [her] incapacity, any abuse, neglect or refusal to parent the [C]hildren." Id.

> [Mother's] continued inability to sustain mental health treatment, the ongoing criminal activity, the inability to find appropriate housing, to schedule appointments to ensure that her needs are met, and to maintain contact to even come to her visitation and to confirm it continues to be an issue, and her continued non-compliance with the random urine screens.

Id. at 57.

CYF next presented the testimony of Dr. Neil Rosenblum, a licensed clinical psychiatrist at Allegheny Forensic Associates, who evaluated Mother and the Children several times since 2016. Dr. Rosenblum testified that he conducted two individual evaluations of Mother, one in June 2016 and the other in March 2017. Id. at 81. Discussing the difference between the two evaluations, Dr. Rosenblum opined:

> Well, I have to say that not a great deal has changed. When I first met with [M]other, she was living with her mother in McKees Rocks to the best of my knowledge. That was in June of 2016. And when I conducted my more recent evaluation with her this month, March 7, 2017, she was still living with her mother. She was still involved with a new boyfriend by the name of Zach, who she's been involved with now for approximately two years on and off, give or take rather.
>
> She was in methadone treatment at the time of the initial evaluation and was still in methadone treatment at the time of the second evaluation. Mother does have a long-standing and acknowledged history of substance abuse problems that started initially as a late teenager using marijuana and she indicates that she was introduced to opioids when she started a relationship with [Father] in her early twenties, I believe.
>
> She acknowledges that use of initially pain pills and then later heroin became a long-standing problem that she has

- 10 -

struggled with throughout her adult life. She would typically go off of the heroin when she got pregnant. I don't believe either [K.R.] or [E.R.] were born drug-exposed, but sometimes she would take Subutex, buy it on the street, which is typically the opioid blocker that is used for pregnant women or would sometimes use Suboxone, which is a variation of the same. But she acknowledges that it has been very challenging for her to remain drug free. She has been attending methadone [sic] at the Alliance program, I believe for over a year or possibly a little bit longer than that.

[Mother] also does have a very acknowledged history of mental health problems. She was diagnosed with ADHD as a child and actually continues to display signs of inattention and restlessness and difficulty concentrating. She has also been diagnosed with a mood disorder, a form of bipolar disorder, with mood swings and some symptoms of hypomania such as racing thoughts and rapid speech. She has a lot of sleep difficulties, which is also characteristic of that disorder.

And she has been prescribed psychotropic medication in different programs, but has had difficulty staying in programs. I believe she was kicked out of Staunton Clinic for missing appointments. She was asked to leave the Crossroads counseling program because she was non-compliant with the Adderall and tried to get a larger prescription or forge a prescription, something of that nature. Then, she did more recently discontinue her last mental health treatment within the past year at Mercy . . ., because she felt that she didn't like the medications that they were prescribing for her and they wouldn't prescribe the stimulant medication, Adderall, because of her problems in regulating that in the past.

[Mother] is a young woman who has struggled with self-esteem problems throughout her life. She has difficulty with her personal identity, with feeling good about herself. She certainly carries a lot of guilt about what she has put herself and her children through over the years. And she recognizes that she has made a lot of bad decisions and used poor judgment. She has largely been dependent on men, primarily [Father]. She got involved with him when he was married. She indicated that when his wife found out, she forced her to have an abortion, but later did go on to have two children with him. But he would go to jail and she'd sometimes feel abandoned. Then, broke off with him

about two years ago around the time the [C]hildren were removed. Again, now, is in another relationship with someone who I believe is in recovery. I have not met her current paramour. She's also had a loving relationship with her mother and actually grew up with her mother, according to [Mother], abusing drugs at times. I believe her father drank excessively. So she's admittedly had a very challenging life.

I think [Mother] is someone who can really love her children. During my most recent evaluation, she was often tearful and she admittedly is very distressed about the prospect of the possibility of losing her children, who she truly cares about. But she does admit that it was very challenging for her to get off drugs and acknowledges that there were some very rough times and some very bad situations for her and the [C]hildren prior to their being removed from her care.

Unfortunately, she has found it difficult to achieve independence in her life. She continues to reside in her mother's home with her paramour. She works different part-time jobs. But she's not really compliant with her mental health treatment. She has not really been able to do much with her methadone treatment other than go for the daily dosages that she is required. She has trouble participating due to social anxiety.

So her overall adjustment remains very compromised and I would say that [Mother] is just psychologically stuck, if I can use that word, in terms of wanting to do better, wanting to feel better about herself and achieve independence, but really at this point has [not] been able to do so.

Id. at 81-85. Discussing his evaluations of the Children, Dr. Rosenblum stated that the Children "have bonded very, very strongly to their new foster parents." Id. at 88. In particular, he opined, "I've been doing these evaluations for over thirty years. I'd have to say that they have become very strongly attached in an extremely short period of time." Id. at 88-89. Dr. Rosenblum attributed the Children's rapid attachment to the new foster family to a "combination of the [C]hildren's desire for love and affection, as well as

very definite strong skills and unusual demonstration of affection, love and commitment to the [C]hildren by [the foster parents]." Id. at 89. He further opined that the Children love their foster parents and speak about "being in their forever home with their foster parents and they are very committed to this family and to the life that they've started to experience in their new family environment." Id. Dr. Rosenblum opined that the Children finally "are getting the attention and the emotional support that they need and that they desire." Id.

With respect to their connection with Mother, Dr. Rosenblum opined that the Children's "relationship with her and their attachment to her has lessened and waned" in the two years since their removal from her care. Id. at 89-90.

> The Children spoke about [Mother], at least their memories of [her], not always taking good care of her. They know that she used drugs, or that she did bad things. They have some recollection whether real or partially created by faded memories, they feel they didn't always have a lot of food in the home, et cetera.
>
> They don't seem to really have a strong desire to visit with [Mother]. Actually, [K.R.] said she'd prefer not to visit, because she gets home late. Again, over time, their relationship has not remained as strong as one might expect. Both children are very eager to be adopted.

Id. at 90. Dr. Rosenblum testified that the Children's connection with the new foster family is "genuine" and that the connection "does have a highly strong probability of being honest and lasting and a placement that is going to be exceptionally supportive and conducive to providing appropriate care of the

[C]hildren on a long-term basis." Id. at 93. The Children have developed close relationships with the extended families of both foster parents. Id.

On cross-examination, Dr. Rosenblum explained that when he evaluated Mother and the Children, the Children did not interact much with Mother. Id. at 96. In fact, they

> played and were much independent in their play. They did not seek out attention from [M]other. Mother tried to be affectionate with the children. She tried to give them kisses and playfully tickle [] them and get them to laugh. But I would say that the [C]hildren were more distant from [M]other than [their older stepsibling].

Id. Dr. Rosenblum opined that the Children would benefit "from at least limited contact with" Mother "as long as [it is] not disruptive to the lives of the [C]hildren and [does not] interfere with the primary relationships that they are establishing to the new caregivers." Id. at 100.

On April 10, 2017, the orphans' court granted CYF's petitions to involuntarily terminate Mother's and Father's[3] parental rights to the Children under Section 2511(a)(2), (5) and (8) and (b) of the Act. Mother timely appealed. Following Mother's filing of a Pa.R.A.P. 1925(a)(2)(i) and (b) statement of errors complained of on appeal, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal, Mother raises three issues for our review, which we repeat verbatim:

> [I.]    Did the trial court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate

_____

[3] Father has not contested termination of his parental rights to the Children.

Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5,) and (8)?

[II.] Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S.A. § 2511(b)?

[III.] Did the trial court abuse its discretion and/or err as a matter of law by failing to appoint legal counsel for the children?

Mother's Brief at 7.[4]

Our standard of review for an order involuntarily terminating parental rights is well established.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). Involuntary termination of parental rights ("TPR") is governed by Section 2511 of the Act, 23 Pa.C.S.A. § 2511, which requires a bifurcated analysis.

---

[4] Contrary to Mother's first issue, the orphans' court did not terminate Mother's parental rights under Section 2511(a)(1). As noted earlier, CYF sought termination only on the basis of Section 2511(a)(2), (5) and (8) and (b).

- 15 -

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standards of the best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). "The standard of clear and convincing evidence is defined as testimony that is so 'clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.'" In re Adoption of G.L.L., 124 A.3d 344 (Pa. Super. 2015) (quoting In re Adoption of S.M., 816 A.2d 1117, 1122 (Pa. Super. 2003) (additional citations omitted)).

In the matter sub judice, the orphans' court found that clear and convincing evidence was presented for terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a) (2), (5), and (8). These subsections provide for termination of parental rights if:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and the termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of the removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(2), (5), and (8). To affirm the trial court's termination of Mother's parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), appeal denied, 863 A.2d 1141 (Pa. 2004). Without considering the orphans' court determinations under Section 2511(a)(2) and (5), we shall proceed to review whether the orphans' court erred in terminating Mother's parental rights to the Children under Section 2511(a)(8). "[T]he analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent." In re C.L.G., 956 A.2d 999, 1008-09 (Pa. Super. 2008).

To terminate parental rights under Section 2511(a)(8), the trial court must find by clear and convincing evidence that:

(1) [t]he child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

In re C.W.U., Jr., 33 A.3d 1 (Pa. Super. 2011) (quoting In re Adoption of M.E.P., 825 A.2d 1266, 1275-75 (Pa. Super. 2003) (additional citations omitted)).

As of December 6, 2016, the date the termination petitions were filed, the Children had been outside of Mother's care for more than 12 months.

As of the time of Mother's termination hearings, the conditions that led to the Children being removed from Mother's care continued to exist.

The Children's family initially came to the attention of CYF in July 2009, following Mother's release from jail. Trial Court Findings of Fact, 4/10/17 at #13. CYF again became involved with the family after receiving reports an older step-sibling suffered a black eye and experienced other physical ailments. Id. CYF also received reports that Mother and Father suffered homelessness, and the Children were experiencing neglect. Id. On March 22, 2013, CYF became involved with the family again after receiving reports of drug and alcohol abuse at the home and medical neglect of the Children. Id. When the family was again able to be found in approximately September 2014, Mother admitted at that time to homelessness and heroin abuse. Id. at #14.

In April 2015, CYF sought an ECA because of ongoing substance abuse which was denied. Id. at #15. Subsequently, CYF received reports that the

older children were caring for the younger children and that Mother was using suboxone without a prescription. Id. at #16. The Children were placed with relatives with visits by the parents. Id. Nonetheless, the parents' substance abuse continued with Mother testing positive for THC and cocaine. Id. On June 9, 2015, CYS applied for and was granted an ECA. Id. at #17. The Children were placed in foster care with a nonrelative. At that time, the Children were dirty, underweight, behind on their immunizations and E.R. appeared to have a burn mark on his head. Id. Following removal, the juvenile court ordered Mother and Father to receive drug and alcohol evaluations and treatment, random urine screens, to complete parenting classes, and to visit with the Children upon confirmation 24 hours in advance. Id. at #18.

The Children were adjudicated dependent on September 23, 2015. Id. at #19. At that time, Mother lacked appropriate housing, the Children appeared to be suffering from medical neglect, and both Mother and Father continued to abuse controlled substances. Id. The Children continued to lack appropriate supervision. Id. Following removal of the Children, Mother began to participate in a methadone maintenance program and remained in compliance with that program, but was not successful in stepping down or decreasing her methadone use. Id. at #20. Since April 2015, Mother was scheduled for 41 urine screens, of which she only attended 9. Id.

In February 2017, after having incurred new criminal charges for possession of controlled substance, Mother received a sentence of probation.

Id. at #21. This conviction is evidence of her failing to resolve her drug abuse. See In re C.L.G., 956 A.2d at 1006-07 (finding that appellant's incarceration for a drug offense is a direct consequence of her drug abuse, and such drug-related issues continued to impede her ability to care for her children).

To address Mother's homelessness, CYF referred her for services. Id. at #22. However, Mother continued to reside in her mother's home. Id.

Mother admitted to suffering depression and ADHD symptoms. Id. CYF offered her mental health treatment services, but Mother was not compliant or otherwise chose to discontinue treatment and has not reported successful completion of a mental health program. Id. Although Mother succeeded with the requirements she attend a parenting program, Mother acknowledged her problems with substance abuse, and the challenge of maintaining a drug-free lifestyle. Id. Mother also recognizes her shortcomings in providing the Children with adequate parental supervision and care. Id. at #23. Since June 2016, Mother was scheduled for 70 visits with the Children of which she attended only 35. Id. at #24. The Children have been removed from their initial placement as of December 23, 2016, and continue to reside with a foster family.

The orphans' court found Mother failed to provide the Children with stability and security, parental supervision and care. She failed to comply with the goals to obtain stable housing, to successfully complete drug and alcohol treatment, and regularly attend urine screens. Mother additionally attended only half of her scheduled visits with the Children since June 2016.

She has been unable to sustain mental health treatment and suffers ongoing difficulty maintaining housing. The orphans' court found that Mother's failure to give priority to parenting and to provide a stable, secure environment for the Children has caused the Children to remain in care. Id. at #33. In summary, the reasons that caused the Children to be removed from Mother continued to exist as of the time of the TPR proceedings.

The orphans' court also found that terminating Mother's rights would best serve the needs and welfare of the Children. As more fully discussed, supra, K.R. and E.R. have been thriving with their foster family, their behavioral problems have become less pronounced, and their needs are being met. The record supports these findings.

Upon consideration of the foregoing, we conclude CYF met it burden to prove by clear and convincing evidence that Mother's parental rights should be terminated under Section 2511(a)(8). The orphans' court did not abuse its discretion or err as a matter of law by so finding.

We now address whether the orphans' court committed an abuse of discretion or error of law by concluding CYS met its burden of proof by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Children under Section 2511(b). Section 2511(b) provides:

> The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical

care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).  Moreover, we have held that:

Section 2511(b) "focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child."  In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010).  As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act.  Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis."  In re K.K.R.-S., 958 A.2d 529, 533 (Pa. Super. 2008).  "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child."  In re N.A.M., 33 A.3d 95, 103 (Pa. Super. 2011) (citing K.K.R.-S., 958 A.2d at 533-36).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

In re Adoption of C.D.R., 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting N.A.M., 33 A.3d at 103).  As discussed above, the Children are thriving while being cared for by their foster family.  The foster family is providing the Children a support system and meeting their emotional, physical, and psychological needs.  The Children's behavioral problems have improved since they have been in the care of the foster family.  Testimony at the hearing

further established that the Children have bonded with the foster family, and do not look to Mother to provide for their needs. While Dr. Rosenblum testified that the Children would benefit from some contact with Mother, and the Children have some lingering affection for Mother, there was overwhelming testimony that it is in the Children's best interests to terminate Mother's parental rights. Thus, we find that the orphans' court did not abuse its discretion when it terminated Mother's parental rights pursuant to Section 2511(b).

We now address Mother's final issue that was the basis for this Court to consider these matters for en banc consideration; whether in these TPR proceedings, the orphans' court abused its discretion when it failed to appoint legal counsel for the Children under Section 2313(a) of the Act. Section 2313(a) provides as follows:

> (a) Child.--The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian ad litem to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S.A. § 2313(a) (emphasis added). With respect to appointment of counsel, our review of the record reveals the following.

On June 19, 2015, the juvenile court entered separate orders appointing

KidsVoice as guardian ad litem ("GAL") in dependency proceedings for K.R.

and E.R. [5]   Its orders provided that:

> KidsVoice is hereby appointed Guardian ad litem (GAL) for the above-named minor child (Child), to represent the legal interests and best interests of Child in connection with any proceedings related to dependency, including any proceeding before a hearing officer, administrative hearings and reviews.
>
>      If the grounds for dependency DO NOT fall within paragraph (1), (2), (3), (4) or (10) of the definition of Dependent Child in 42 Pa.C.S.A. § 6302, KidsVoice is appointed as attorney for child.

Juvenile Court Orders, 6/19/15, at 1.

On September 23, 2015, the juvenile court entered orders of

adjudication and disposition finding, by clear and convincing evidence, the

Children dependent pursuant to the Pennsylvania Juvenile Act at 42 Pa.C.S.A.

§ 6302.   Almost one year later, on September 15, 2016, the juvenile court

entered orders granting motions to schedule hearings on requests by CYF for

goal changes and TPR hearings.   Goal change and termination proceedings

began on March 24, 2017.   At that time, KidsVoice, through its counsel,

indicated that it was appearing as guardian ad litem for the Children.   N.T.

Trial, 3/24/17, at 2-3.   During the course of cross-examination, counsel for

---

[5] A guardian ad litem also was appointed for the Children's stepsibling.  At the termination proceedings, Mother withdrew her contest with respect to the stepsibling, indicating that she was happy with the stepsibling's current placement.  N.T., 3/24/17, at 105.  Accordingly, we concern ourselves only with the matter of representation for K.R. and E.R.

KidsVoice indicated that she was the "attorney" for the Children. Id. at 101. At the conclusion of the termination proceedings, counsel for KidsVoice indicated that the Children expressed their wish to be adopted by their foster care family, or as the younger child indicated, "their forever home," id. at 112-13, and agreed that CYS met its burden to terminate parental rights by clear and convincing evidence. The orphans' court docket does not indicate that the court ever entered a separate order appointing counsel for Children for the goal change and termination proceedings. In fact, the record is silent in this regard.

Since we conclude that our Supreme Court's decision in T.S. controls the representation issues raised by Mother's appeals, we proceed first to discuss that decision.

In T.S., CYF sought in July 2015 an emergency custody authorization to remove children, T.S. and E.S., from their mother's care, as it believed it no longer could ensure the safety of the children in mother's care. At that time, T.S. and E.S. were approximately 2 and 1 years old, respectively.[6] The children were adjudicated dependent and placed with foster parents. For the placement and permanency review period that followed, the court appointed KidsVoice to represent the Children's best and legal interests in compliance with Section 6311 of the Juvenile Code.[7] In late 2016, CYS filed a petition to

---

[6] T.S. was born in June 2013 and E.S. was born in August 2014.

[7] See 42 Pa.C.S.A. § 6311; Pa.R.J.C.P. 1154.

terminate mother's parental rights. CYF and mother were represented by counsel, and as reflected on the hearing transcript and TPR docket sheet, the children were represented by counsel from KidsVoice. The orders appointing KidsVoice to represent the children in the dependency proceedings stated it was to represent their legal and best interests, and it was undisputed that the dual function carried over into the termination proceedings. The children therefore, had continuity of representation between dependency and termination proceedings. However, no independent counsel represented solely the children's legal interests in the termination proceedings. Upon conclusion of the termination proceedings on February 3, 2017, the court terminated mother's parental rights to both children. Mother appealed to this Court.

While mother's appeal in T.S. was pending in this Court, our Supreme Court decided L.B.M. on March 28, 2017. In her appellate brief, mother claimed for the first time that children should have been represented by appointed counsel separate from the GAL at the termination proceeding. She argued the failure to do so was structural error and her failure to raise the issue previously should be excused because our Supreme Court had not yet ruled in L.B.M. at the time of the February 3, 2017 hearing. Both CYS and the GAL maintained mother waived this issue.

Before reaching the merits of mother's representation claim, the T.S. Court addressed whether the issue of the children's right to counsel under

Section 2313(a) was waivable. The Court first noted that while the failure to appoint counsel implicates structural error, that does not in itself resolve the waiver question. Structural error means only that no harmless-error analysis is relevant. T.S., 192 A.2d at 1087. Structural error does not always imply non-waivability. Id. Nonetheless, the Court concluded that the particular type of alleged error was non-waivable. The statutory right to counsel under Section 2313(a) belongs to the child, not the parent. The issue was non-waivable as there was no attorney representing solely the children's legal interests who could have raised their rights in the trial court, and the children plainly could not have done so themselves. Id. As important, the Court also concluded that the failure of any party, including mother, to affirmatively request separate counsel for the children cannot constitute waiver. Id.

The Court next addressed whether an attorney-GAL may represent a child's best and legal interests simultaneously in a termination proceeding, or whether the failure to appoint separate counsel to represent a child's legal interests constitutes error. At the outset of its decision, the Court summarized those points upon which a majority of the L.B.M. Court agreed: (a) in a TPR proceeding, the first sentence of Section 2313(a) requires a common pleas court to appoint an attorney to represent the child's legal interests, i.e., the child's preferred outcome; (b) where there is a conflict between a child's legal and best interests, an attorney-GAL, who advocates for the child's best interests, cannot simultaneously represent the child's legal interests; and (c)

in such a circumstance, the failure to appoint a separate attorney to represent the child's legal interests constitutes structural error not subject to a harmless-error analysis. T.S., 192 A.3d at 1082. The Court then expressly reaffirmed what four Justices in L.B.M. agreed upon; where a child's legal and best interests do not diverge in a termination proceeding, an attorney-GAL representing a child's best interests can also fulfill the role of the attorney appointed under Section 2313(a) to represent the child's legal interests. T.S. 192 A.3d at 1088. Building further upon its analysis, the Court then concluded that where a child's legal interests are not ascertainable during termination proceedings, such as when a child is of a very young age and unable to express a preference, no conflict can exist for an attorney-GAL appointed under Section 2313(a) to represent simultaneously the child's legal and best interests. Id. at 1090, 1092. As a matter of logic, there can be no conflict between an attorney's duty to advance a subjective preference on a child's part that is incapable of ascertainment, and an attorney's concurrent obligation to advocate for a child's best interests, as counsel understands them to be. Id. at 1090. The Court therefore, affirmed this Court's order that concluded the common pleas court did not err in failing to appoint separate counsel to represent the legal interests of the children, T.S. and E.S., who both, due to age, were not able to express their preference in connection to the TPR proceedings.

Returning now to the present consolidated appeals, we initially note similarity in several facts to those in T.S. Both cases present instances where the common pleas court appointed an attorney-GAL to represent the children's best and legal interests in dependency proceedings. That dual representation carried over into TPR proceedings without the issuance of a separate appointment order under Section 2313(a). Both cases also present circumstances where mothers raised the issue of representation for the first time on appeal. Factually, the cases are distinguishable in that the children in T.S. were not capable of expressing their preference due to their young age, whereas here, at the time of TPR proceedings, K.R. and E.R. were approximately 10 and 5 years old, respectively, and were able to express their preferences.

Based upon our Supreme Court's decision in T.S., and its clarification and reaffirmation of principles agreed upon by a majority of Justices in L.B.M., we are able to come to the following conclusions with respect to these consolidated appeals. First, Mother did not waive the issue of whether the orphans' court erred in appointment of counsel for Children in these TPR proceeding by raising the issue for the first time on appeal. This issue is non-waivable. T.S. 192 A.3d at 1087. Second, Mother, as well as any other party, can raise the non-waivable issue of the Children's legal representation. Id. Third, under the circumstances of these appeals, the orphans' court did not commit reversible error by not entering a separate order appointing counsel

under Section 2313(a) for the Children's legal interests. We come to this latter conclusion because the Children were able to express their preferences to counsel, counsel expressed those preferences, as well as the Children's best interests to the orphans' court, and there was no conflict in these positions. Although the orphans' court did not enter a separate order of counsel appointment for the TPR proceedings, we conclude this was not reversible error, as the Children's legal interests were adequately represented.

In closing, we too would like to echo our Supreme Court's view that it would be a better practice for a court to place an order on the record formalizing a GAL's role in termination proceedings. T.S. 192 A.3d at n.19. As appointment of counsel to represent a child's legal interests is mandatory under Section 2313(a), clarifying a GAL's role in TPR proceedings ensures that simultaneous representation of a child's legal and best interests is properly considered. When counsel possesses information that gives rise to a conflict that may be detrimental to a child's legal interests, counsel should move the court for appointment of a separate counsel. Doing so is consistent with counsel's ethical obligations under our rules governing the attorney/client relationship. See Rule of Professional Conduct 1.7, Conflict of Interest: Current Clients. When a child has a preferred outcome that is ascertainable, counsel representing a child's legal interests, after appropriate consultation with the child, should place on the record the child's preferred outcome. See T.M.L.M., 184 A.3d 585, 591 (Pa. Super. 2018). Where a court appoints an

attorney, but the attorney never attempts to ascertain the child's position and advocates solely for the child's best interests, the child has been deprived impermissibly of his or her statutory right to counsel serving his legal interests. Id. citing L.B.M., 161 A.3d at 174, 180. Effective representation of a child requires, at a bare minimum, attempting to ascertain the client's position and advocating in a manner designed to effectuate that position. T.M.L.M. at 590.

For the foregoing reasons, we affirm the orphans' court orders terminating Mother's parental rights to the Children, K.R. and E.R.

Orders affirmed.

Judges Bowes, Shogan, and Olson join this opinion.

Judge Dubow files a concurring statement in which Judges Panella, Lazarus, and Ott join.

President Judge Gantman, Judges Panella, Lazarus, and Ott concur in the result.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  12/10/2018

- 31 -