J-S21004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: B.L.T.B. | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B. A/K/A C.B., NATURAL MOTHER | : : : : : | |
| | : | No. 84 WDA 2020 |

Appeal from the Decree Dated December 12, 2019
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  No. 2019-884 IVT

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: D.J.T.B. | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: C.B. A/K/A C.B., NATURAL MOTHER | : : : : | |
| | : | No. 85 WDA 2020 |

Appeal from the Decree Dated December 12, 2019
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2019-885 IVT

BEFORE:  LAZARUS, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED APRIL 24, 2020**

C.B. (Mother) appeals from the trial court's final decrees[1] involuntarily

terminating her parental rights to her minor children, B.L.T.B. (born 11/2010)

---

[1] We note that by filing two separate notices of appeal with one docket number on each notice, Mother has complied with the dictates of ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018), which held that "when a single order

and D.J.T.B. (born 6/2009) (collectively, Children).[2]  After careful review, we affirm.

Cambria County Children and Youth Services (CYS) first became involved with Mother's family in April 2012, when Mother was found intoxicated in public with Children.  She was arrested and incarcerated for endangering the welfare of children.  Children were placed in foster care.  CYS developed the following permanency plan for Mother:  complete a psychological evaluation and drug and alcohol assessment, submit to random drug screenings, and find and maintain housing for at least six months.  Reunification was the listed goal at the July 2012 permanency review hearing.  From April 2012 through February 2013, Mother was compliant with her plan objectives.  In February 2013, Children were returned to Mother.  At the next permanency hearing in March, Children were removed again from Mother's custody after she appeared at the county courthouse for a hearing acting belligerent and registering a blood alcohol content (BAC) of .17.  Mother was found to be minimally compliant or non-compliant with her plan at subsequent permanency hearings.

---

resolves issues arising on more than one lower court docket, separate notices of appeal must be filed." ***Id.*** at 977.  ***See also*** Pa.R.A.P. 341(a).

[2] On February 3, 2020, our Court *sua sponte* consolidated the two appeals to be "briefed . . . as if but a single appeal."  Order, 2/3/20.  ***See*** Pa.R.A.P. 513 (consolidation of multiple appeals).

By March 2014, CYS changed the goal from reunification to kinship placement, with the hope that Children's three older siblings could be placed in the same home as Children. At that point, CYS determined that "there was no progress on [Mother's] part [and i]t became clear that [Mother] would not maintain consistent housing and participate in all of her services." N.T. Termination Hearing, 12/4/19, at 22; *id.* at 23 ("It had become clear that [Mother] would not be able to provide a stable situation in terms of housing, financial stability, and she also continued to drink throughout this entire period and that affected her ability to parent in the long-term for [C]hildren.").

In February 2016, CYS found aggravating circumstances with regard to Mother when she failed to maintain contact with the agency or Children for eight months.[3] Although Mother enrolled in some drug and alcohol treatment programs after the placement goal was changed in March 2014, she provided no documentation to CYS to indicate that she had successfully completed the programs. *Id.* at 24. Moreover, Mother was still inconsistent with her mental health treatment[4] and unable to remain sober enough to care for Children. *Id.* By October 2016, the court found that Mother was still non-compliant with her plan, had made minimal progress toward alleviating the

---

[3] Mother apparently was in jail and a homeless shelter for some of that unaccounted for time-period. N.T .Termination Hearing, 12/4/19, at 114-15.

[4] Mother admitted at the hearing that she was diagnosed, at the age of eight, with attention deficit hyperactivity disorder (ADHD), oppositional defiant disorder (ODD), paranoid schizophrenia, and bipolar disorder. N.T. Termination Hearing, 12/4/19, at 153.

circumstances that led Children to be removed from her care, and determined that she was no longer a placement option. At a March 2017 permanency review hearing, Mother was again found to be non-compliant and to have made no progress in alleviating the circumstances necessitating Children's placement. From August 2017 through December 2018, the court found Children's significant relationship with Mother and Father to be a compelling reason not to file petitions to terminate parental rights. However, by May 2019, the court determined that the current placement goal was not appropriate or feasible, discontinued visitation for Mother, changed the goal to adoption, and concluded that CYS had exhausted all available resources to assist Mother's family.[5]

On September 4, 2019, CYS filed petitions to involuntarily terminate Mother's parental rights to Children. On December 4, 2019, the court held a termination hearing, at which three CYS caseworkers, a court-appointed educational decision maker for CYS, a program supervisor of a permanency program, a fieldworker for Independent Family Services (IFS), a CYS social worker, Father, Mother and a blended caseworker from Alternative

---

[5] Mother was arrested before an August 2019 hearing on an outstanding warrant. At her next permanency hearing, Mother, who had since been released from prison, appeared "well dressed," was "well spoken" and informed the court she was employed. N.T. Termination Hearing, 12/4/19, at 117.

Community Resource Program (ACRP) in Johnstown testified.[6] The court subsequently entered decrees involuntarily terminating Mother's parental rights to Children under sections 2511(a)(1), (2), (5) and (b) of the Adoption Act.[7]

Mother filed a timely notice of appeal.[8] She presents the following issues for our consideration:

> (1) Whether the [t]rial [c]ourt erred as a matter of law and/or manifestly abused its discretion in determining [CYS] sustained its burden of proving the termination of []Mother['s] parental rights is warranted under [s]ections 2511(a)(1), 2511(a)(2), and/or 2511(a)(5) of the Adoption Act?
>
> (2) [W]hether the [t]rial [c]ourt nevertheless erred as a matter of law and/or manifestly abused its discretion in determining [CYS] sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of the Children?

Appellant's Brief, at 7 (amended for conciseness).

---

[6] The court appointed independent counsel, Suzann Lehmier, Esquire, for Children and found that their best interests and legal interests did not conflict. **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[7] 23 Pa.C.S. §§ 2101-2938.

[8] Although the trial court did not order Mother to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, she did, in fact, file a statement.

Mother contends that the court erred in terminating her rights under sections 2511(a) and (b), where CYS did not prove its burden by clear and convincing evidence. We disagree.

Instantly, CYS provided services to Mother from 2012 until May 2019, with the goal of reunification with Children. Mother last saw Children in December 2018. Children had been in placement for more than seven and one-half years at the time of the termination hearing. CYS determined that in addition to Mother's lack of compliance with her plan, she also has a history of domestic abuse with Father, has been involved in a cycle of criminal activity, has a history of lack of housing and "[is] unable to provide for [her]sel[f], let alone [C]hildren." N.T. Termination Hearing, 12/4/19, at 26. When CYS believed it had exhausted all resources available to assist Mother's family, it filed its petitions to terminate Mother's parental rights. Specifically, CYS caseworker Ramona Reed testified that Children "deserve consistency in their health, safety, and welfare [and] . . . need a safe, stable environment." *Id.*

Doctor John Jubas, a court-appointed educational decision maker for CYS who had been involved in Children's case for approximately four years, opined: "[T]o uproot these children from this particular environment right now would be detrimental" where they "have been embraced by the school[, . . .] embraced by their [foster] family[, and] the community has accepted these children." *Id.* at 65. Doctor Jubas testified that since Children have ceased visiting with Mother and Father, he has noticed more stability and a positivity with Children. *Id.* at 61. The doctor also stressed that at Children's

current ages where they are on the heels of entering middle school, it is imperative that they stay in their current supportive environment "in order to branch the[ir educational and social] success." *Id.* at 67-71. Finally, Dr. Jubas testified that Children have finally "found love" in a new "family unit" that "give[s] them [] comfort when times are bad, give[s] them [] comfort when times are sad[, b]ut also gives them [] comfort when everything is going great [like now]." *Id.* at 72.

Cindy Hajjar, a program supervisor at a visitation home where children in foster care visit with their birth parents, testified regarding two visits Children had with Mother. She stated that Children became very physical with Mother, to the point where D.J.T.B. had Mother in a headlock in the parking lot. When a staff member directed Child to cease the behavior, Mother told the employee that is was OK because they "need[ed] to make him tough." *Id.* at 75. Mother also reportedly pushed the Children onto the floor when they would run at her during visits, despite the fact that they were directed to stop by staff. *Id.* Ms. Hajjar described Mother's relationship with Children as "more of a sibling-sibling relationship" where Mother "did not parent them in the sense that she would correct them[.]" *Id.* at 77. Rather, Ms. Hajjar testified that Children's oldest sibling was the individual they would look to for direction at visits. Finally, Ms. Hajjar testified that she would have concerns if Children were returned to Mother because they do not have a true parent-child bond with her and she does not believe that they would be able to parent them and direct them appropriately. *Id.* at 79.

Kathy Scaife, a fieldworker for IFS, scheduled 42 in-home appointments with Mother from September 2012 to March 2014. Mother attended 27 of the scheduled meetings. For the first six months of Scaife's services, Mother had obtained housing. However, after that time period, Mother was evasive in giving Ms. Scaife information and her compliance and progress with service objectives steadily declined. Ms. Scaife testified that she did not believe Mother had shown sufficient progress to make her capable of obtaining, keeping or providing a safe home for Children. *Id.* at 86. In fact, IFS's March 2014 discharge summary for Mother noted that local police had indicated Mother continued to have issues with domestic violence, and substance abuse, and that criminal charges were pending against her. Both IFS and CYS workers did not believe Mother understood how her actions negatively affected her ability to care for Children, or that Mother would ever understand that her own behavior and actions could result in Children's ultimately being adopted. Finally, Ms. Scaife testified that she supported both the goal change and termination of Mother's parental rights to Children. *Id.* at 87.

CYS caseworker Ashley Shaffer, who provides in-home parenting decision-making services, testified that she worked with Mother from September 2012 to September 2013. Ms. Shaffer testified that Mother was inconsistent in attending her appointments and, although she did well the first six months of her services, Mother's drinking, parenting skills and mental health became a problem again, necessitating Children being returned to placement in April 2013. Mother did not take her prescribed medication for

- 8 -

her mental health issues while she worked with Ms. Shaffer, causing Mother to be hyperactive to the point of making her incapable of parenting Children. Mother did not understand why she needed to curb her drinking during visits with Children and did not comprehend how her noncompliance with mental health and drug and alcohol services affected her ability to keep Children safe. *Id.* at 93. In fact, Mother appeared to be under the influence of alcohol at several of her appointments with Ms. Shaffer and her staff. In September 2013, Mother was discharged from CYS in-home parenting services due to her repeated failure to attend appointments. Ms. Schaffer testified that it would not be safe to return Children to Mother unsupervised, where she still needed treatment, counseling, parenting skills training and medication. Finally, Ms. Schaffer testified that termination would be in Children's best interests, would not be detrimental to them where they have been in foster care for seven years and need permanency in their lives, and that it would be very difficult to transition them back into Mother's home having been in placement for such an extended period of time. *Id.* at 95, 99.

Beginning in April 2018, Tammi Yeckley worked with CYS to establish permanency for Children by consulting with a team of professionals. At first the team sought to keep Children and their older siblings together in kinship placement. However, when this proved to be an impossible task, Ms. Yeckley moved toward permanency for Children, which ultimately made Children eligible for adoption through the foster care process. Ms. Yeckley testified

that it would be in Children's best interests to terminate Mother's parental rights. *Id.* at 107. [9]

At the termination hearing, Mother testified that she missed visits with Children because she was either incarcerated at the time, in rehabilitation, or in a psychiatric hospital. *Id.* at 153. She testified that she is currently on medications for her mental health conditions, *see supra* at n.5, has a support system in her church and church family, has not seen Children since December 2018, but talks to Children on the phone frequently, has been sober for months, has obtained housing, and is filing for divorce from Father to whom she has been married since 2011 and with whom she has been in an ongoing, abusive relationship. *Id.* at 154-58. Mother also acknowledged that she has emotionally damaged Children with her drinking problem; however, she expressed her desire to remain in Children's lives, even if the court terminated her parental rights. *Id.* at 159. Finally, Mother indicated that she is not engaged in any type of alcohol or drug treatment, but "really stay[s] involved with the church" which is her support system and uses her deacon as her "sponsor." *Id.* at 169.

Mother concedes she did not make any real effort to comply with CYS' plan to reunify with Children until August of September of 2019 – more than

_____

[9] All witnesses who testified on behalf of CYS recommended that Children continue contact with their three older siblings with whom they are bonded.

*seven years* after Children were removed from her care. ***Id.*** at 165.[10]  As this Court has emphasized, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."  ***In re Adoption of R.J.S.***, 901 A.2d 502, 513 (Pa. Super. 2006).

The overwhelming evidence demonstrates that Children are in need of permanency and are thriving in a foster home that is a pre-adoptive resource where they receive the love, emotional, physical and developmental support and stability they so deserve.  Record evidence, particularly that of Dr. Jubas, pports the fact that termination would be in Children's best interests.  Based on this clear and convincing evidence, we affirm the trial court's decrees terminating Mother's parental rights under sections 2511(a)(1)[11] (grounds for termination include parental conduct "continuing for a period of at least six

---

[10] Mother's blended case manager testified that she did not begin working with Mother until September 30, 2019 — 26 days *after* CYS filed the instant termination petitions.  ***See*** 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.").

[11] We note that "we may uphold a termination decision if any proper basis exists for the result reached."  ***See In re B.C.***, 36 A.3d 601, 606 (Pa. Super. 2012).

months immediately preceding the filing of the petition either [] evidenc[ing] a settled purpose of relinquishing parental claim to a child or [] refus[ing] or fail[ing] to perform parental duties.") and § 2511(b) ("The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.").[12]

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/24/2020

---

[12] Tragically, over the 7½ years Children have been in placement, they have been in and out of 15 different foster homes.