**[J-34A-2020, J-34B-2020, J-34C-2020 and J-34D-2020] [MO: Baer, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| IN RE: ADOPTION OF K.M.G. | : | No. 55 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: T.L.G., MOTHER | : | Superior Court entered September |
| | : | 13, 2019 at No. 580 WDA 2018, |
| | : | affirming the Decree entered March |
| | : | 5, 2018 in the Court of Common |
| | : | Pleas of McKean County at No. 42- |
| | : | 17-0239. |
| | : | |
| | : | SUBMITTED: April 16, 2020 |
| | | |
| IN RE: ADOPTION OF: A.M.G. | : | No. 56 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: T.L.G., MOTHER | : | Superior Court entered September |
| | : | 13, 2019 at No. 581 WDA 2018, |
| | : | affirming the Decree entered March |
| | : | 5, 2018 in the Court of Common |
| | : | Pleas of McKean County at No. 42- |
| | : | 17-0240. |
| | : | |
| | : | SUBMITTED: April 16, 2020 |
| | | |
| IN RE: ADOPTION OF S.A.G. | : | No. 57 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: T.L.G., MOTHER | : | Superior Court entered September |
| | : | 13, 2019 at No. 582 WDA 2018, |
| | : | affirming the Decree entered March |
| | : | 5, 2018 in the Court of Common |
| | : | Pleas of McKean County at No. 42- |
| | : | 17-0241. |
| | : | |
| | : | SUBMITTED: April 16, 2020 |
| | | |
| IN RE: ADOPTION OF J.C.C. | : | No. 58 WAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: T.L.G., MOTHER | : | Superior Court entered September |
| | : | 13, 2019 at No. 583 WDA 2018, |

: affirming the Decree entered March
: 5, 2018 in the Court of Common
: Pleas of McKean County at No. 42-
: 17-0242.
:
: SUBMITTED: April 16, 2020

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                      **NOVEMBER 10, 2020**

Our General Assembly made a promise to the children of our Commonwealth: "The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents."[1] This promise is not a suggestion. It is not a "best practice." It is not something that we hope our trial courts might consider. It is the law.

The Majority adopts an impoverished view of the statutory mandate; it opines merely that an appellate court "should verify that the orphans' court appointed counsel to represent the child's legal interests."[2] This does not go far enough. In these critically important proceedings, with permanent severance of the child-parent relationship on the line, children are entitled to receive the full benefit of their statutory right to counsel. This is a matter of statutory right, not of judicial grace. The right is hollow without firm assurance that legal counsel has no conflicting obligation that interferes with zealous

---

[1]     23 Pa.C.S. § 2313(a).

[2]     Maj. Op. at 2.

advocacy in furtherance of the child's interests.  To fulfill the statutory mandate, *sua sponte* appellate review of the appointment is required.

The Majority recites the facts that led to the termination of T.L.G. ("Mother")'s parental rights.[3]  On February 24, 2017, after a period of dependency, the juvenile court granted CYS's request to remove K.M.G., A.M.G., S.A.G., and J.C.C. ("Children") from Mother's home and to place them in the home of the aunt and uncle ("Foster Parents") of C.J.C. ("Father").  After observing Mother's sustained inability to resolve recurring problems with Children's care, CYS filed petitions to involuntarily terminate Mother's parental rights.

On January 8, 2018, the orphans' court appointed Mark Hollenbeck, Esquire ("Hollenbeck"), who had served as Children's guardian *ad litem* ("GAL") since 2016, to serve thereafter as both GAL and legal counsel for Children in the termination of parental rights ("TPR") proceeding.  With no appointment colloquy or other proceeding, the orphans' court entered an identical order at each docket number stating:

> **AND NOW,** this 8th day of January, 2018, a Petition having been filed to terminate the parental rights of Mother; and, the court having found that the Guardian *ad litem*, Mark J. Hollenbeck, Esq., *may adequately represent both the child's best interests and legal interests without conflict* (*See*, [*In re D.L.B.*, 166 A.3d 322 (Pa. Super. 2017)]); IT IS ORDERED AS FOLLOWS: Mark J. Hollenbeck, Esq., the [GAL] for [the child], shall represent both the best interests and legal interests of the subject child.  Any party objecting to said dual representation shall file a written objection within ten (10) days of the date of this order.[4]

---

[3]  *See id.* at 3-8.

[4]  Order, *In re: K.M.G.*, No. 42-17-0239, 1/8/2018 ("Orphans' Court Appointment Order") (emphasis added); *see also* Order, *In re: A.M.G.*, No. 42-17-0240, 1/8/2018; Order, *In re: S.A.G.*, No. 42-17-0241, 1/8/2018; Order, *In re: J.C.C.*, No. 42-17-0242, 1/8/2018.

As GAL, Hollenbeck was tasked with advocating Children's best interests. "'Best interests' denotes that a guardian *ad litem* is to express what the guardian *ad litem* believes is best for the child's care, protection, safety, and wholesome physical and mental development regardless of whether the child agrees."[5] But as Section 2313(a) "legal counsel,"[6] Hollenbeck had an additional duty, a very different one: he was required to advocate for Children's legal interests. "'Legal interests' denotes that an attorney is to express the child's wishes to the court regardless of whether the attorney agrees with the child's recommendation."[7] The distinction between the two is critically important, because a GAL's assessment of a child's best interests will not always align with the child's legal interests—the child's own preferences. In this particular case, no party objected to the orphans' court's dual appointment, that is, its decision to designate Hollenbeck to represent both Children's "best interests" and Children's "legal interests."

On February 12, 2018, the orphans' court held a hearing on CYS's petition to involuntarily terminate Mother's parental rights.[8] At the time of the hearing, A.M.G. was

---

[5]    Pa.R.J.C.P. 1154, cmt.

[6]    Section 2313(a) of the Adoption Act provides as follows

**(a) Child.**—The court shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents. The court may appoint counsel or a guardian *ad litem* to represent any child who has not reached the age of 18 years and is subject to any other proceeding under this part whenever it is in the best interests of the child. No attorney or law firm shall represent both the child and the adopting parent or parents.

23 Pa.C.S. § 2313(a).

[7]    *See* Pa.R.J.C.P. 1154, cmt.

[8]    Father did not contest the termination of his parental rights.

eight years old, S.A.G. was six, K.M.G. was five, and J.C.C. was two. Present at the hearing were attorneys for CYS and for Mother, as well as Hollenbeck. The Majority reviews the evidence that the orphans' court relied upon in terminating Mother's parental rights, but the Majority's account omits an important (and distinctly troubling) pattern in Hollenbeck's participation.

Specifically, although only Children could speak conclusively about their feelings concerning termination, Hollenbeck asked none of the nine testifying witnesses any questions that might illuminate Children's feelings about the termination of Mother's parental rights. For example, under questioning by CYS's attorney, CYS intake worker Megan Messler described how J.C.C. specifically had a "good bond with mom."[9] Nonetheless, Hollenbeck did not further inquire about the bond between any of the other Children and Mother or about Children's feelings about the situation.[10]

Joshua Blotzer, a CYS caseworker, testified that, when Children visited with Mother while they lived in Foster Parents' home, "they would smile, they'd try to get her attention, you know they'd want to interact with her."[11] Hollenbeck did not ask Blotzer about Children's relationship with Mother or Children's wishes.

Jonathan Braeger, the CYS Supervisor, also testified. Braeger stated that "[t]he children do say mom when they talk with mom—and when I've talked to them at home,

---

[9]     Notes of Testimony, TPR hearing, 2/12/2018, at 38 ("N.T.").

[10]    *Id.* at 47-52.

[11]    *Id.* at 80.

they have—they do mention mom."[12] But Hollenbeck's only question for Braeger involved Children's dental treatment.

Tate Slavin-Miller, a court-appointed caseworker, testified that Children wanted to live together. She noted that Children were separated in different foster homes for a spell, and she "noticed that the children were really craving to be together and to be reunited."[13] When Children were reunited with Mother briefly, Slavin-Miller "saw them come together and really thrive off of being together."[14] Asked whether Children had a bond with their mother, Slavin-Miller replied:

> I feel like yes in the beginning I know that they—they often talk about their mother and then seeing them in the home with her I—to be perfectly honest, I know that they love their mother and they did have a relationship with her but that bond of like parent/children I always hoped that it would occur and there would be that separation but in my time with the children being in home with her I just saw the disconnect in that regard. But I do know that they—that they love their mother.[15]

Slavin-Miller also recalled how, while in foster care, Children would eagerly await phone calls from Mother and would be unhappy if Mother did not call.[16] In questioning Slavin-Miller, Hollenbeck failed to develop the record on these or any related points.

Children's maternal grandmother ("Grandmother") also testified. Mother's counsel asked Grandmother if she had seen Children and Mother interact, and Grandmother told

---

[12] *Id.* at 107.

[13] *Id.* at 117.

[14] *Id.*

[15] *Id.* at 122.

[16] *Id.* at 126.

the court that she had. Grandmother stated that "the day before Christmas[, Children] were excited they were getting presents from grandma and mommy."[17] Grandmother also told Mother's counsel how the relationship between Mother and Children had become "a little strained" and that Children were "almost afraid to talk to" Mother in recent months.[18] Hollenbeck did not see fit to ask any questions.[19]

Counsel for CYS and Mother, as well as Hollenbeck, each made closing arguments. CYS's attorney told the orphans' court that "[a]ll of those witnesses have indicated to the court that while the children have a relationship with their mother and love their mother but [*sic*] they are bonding well in the foster home."[20] Mother's counsel argued that "there is a bond between mom and the kids, there was testimony presented that the children seemed to be more despondent, more upset, worse behaved at times when the children were not having regular contact with mother."[21]

In relevant part, Hollenbeck closed as follows:

I support [CYS's] recommendation [to involuntarily terminate Mother's parental rights]. Threshold thought I always have is in some of these cases are we dealing with bad people or not. This is not that type of case. We're dealing with a lack of capacity issue, in my opinion. . . . We have children that were not going to school before[,] now they're thriving in school, we had this head lice problem that just could not be fixed until [Foster Parents] got

---

[17]     *Id.* at 179.

[18]     *Id.* at 180.

[19]     Hollenbeck similarly asked few or no questions, and none seeking to illuminate Children's preferences, of testifying witnesses Michelle Hatch, a Housing Case Manager for the McKean County Redevelopment and Housing Authority; Edward McQuillen, a CYS caseworker; R.W., Father's paternal uncle and one of Children's foster parents; or Father.

[20]     *Id.* at 198.

[21]     *Id.* at 201-02.

on top of it and fixed it, we have this dental issue that still, paying dividends in a bad way, with the kids and not being overly dramatic but there was testimony it could have resulted in death if it had continued to be ignored. So I just think [Mother] loves the kids, I don't think she did any of this on purpose, I don't think she had the capacity to properly care for these children and I think it's in their best interest to grant [CYS's] Petition.[22]

Hollenbeck made no comment whatsoever regarding Children's preferences or regarding his efforts (if any there were) to ascertain their feelings, nor did he aver that Children's preferences were consistent with his assessment of their best interests. Thereafter, the trial court concluded that CYS had established by clear and convincing evidence that Mother's parental rights should be terminated.[23]

Mother appealed to the Superior Court, arguing that CYS had not met its burden to sustain involuntary termination of her parental rights under Section 2511(a). Although Mother did not allege a conflict between Hollenbeck's service as GAL and his representation of Children's legal interests, the Superior Court, sitting *en banc*, considered on its own initiative—with the benefit of supplemental briefing by the parties and *amici curiae*—whether it could review the record *sua sponte* to consider whether Hollenbeck's assessment and understanding of Children's best interests as GAL was in harmony with what he had gleaned of Children's legal interests in his role as legal counsel—or whether and how Hollenbeck had gleaned Children's feelings and preferences to begin with.[24]

---

[22]    *Id.* at 202-03.

[23]    *See* Maj. Op. at 8.

[24]    *See In re K.M.G.*, 219 A.3d 662, 669 (Pa. Super. 2019) (*en banc*).

By that time, this Court had made clear that an orphans' court's failure to appoint Section 2313(a) legal counsel is structural error and therefore non-waivable on appeal.[25] Superior Court decisions had established that, as such a failure is structural and non-waivable error, an appellate court can review *sua sponte* the narrow question of whether legal counsel had been appointed at all. The *K.M.G.* court effectively took for granted the validity of those decisions, and this Court now adopts their holdings.[26] But the Superior Court probed the matter more deeply, asking whether it could reach past the mere fact of the appointment to assess whether cross-appointed counsel's assessment of Children's best interests conflicted with Children's legal interests or whether counsel failed to attend carefully enough to Children's legal interests to identify such a conflict, if any.

The Superior Court majority determined that such an assessment was beyond its purview. It deemed review unnecessary because three mechanisms exist which ensure "that the GAL does not have a conflict at an involuntary termination hearing."[27] First, Pennsylvania Rule of Professional Conduct 1.7[28] requires an attorney to notify the client if he or she has a conflict, a requirement that would appear by extension to require notifying the court where the client is a child and the conflict arises from a cross-appointment as GAL and legal counsel. Second, "any party has standing to raise the

---

[25]   *See, e.g.*, *In re T.S.*, 192 A.3d 1080, 1086-87 (Pa. 2018).

[26]   *See K.M.G.*, 219 A.3d at 668 (citing *In re K.J.H.*, 180 A.3d 411 (Pa. Super. 2018)); Maj. Op. at 22-24.

[27]   *K.M.G.*, 219 A.3d at 669.

[28]   Rule 1.7 states that "a lawyer shall not represent a client if the representation involves a concurrent conflict of interest." Pa.R.P.C. 1.7(a).

issue of a potential conflict before the orphans' court or Superior Court."[29]  Third, the "orphans' court . . . often decides this issue."[30]

President Judge Emeritus Bender, joined by Judges Kunselman and McLaughlin, disagreed.  The dissent observed that "a failure to correct such an error at this juncture may be the only opportunity to correct a possible injustice."[31]  And if the appellate court found (*sua sponte*) that the child's best and legal interests appeared to conflict, or found that the record contained nothing to indicate the presence or absence of such a conflict, the court should remand the case for the orphans' court to review the extant evidence or further develop the record.  "Merely allowing an objection to be raised in response to the [Orphans' Court Appointment Order] is insufficient because the right to counsel belongs to the children, not to a parent or an agency."[32]  Appellate review of whether cross-appointed counsel is conflicted should not depend upon a third party's election to call the matter into question, but should proceed as a matter of course.

With the intermediate court divided, this important issue has now come before us.  We do not write on an utterly blank slate, as some principles appear in the statute itself and in our precedents interpreting it.  In a TPR proceeding, the "unambiguous language" of Section 2313(a) requires "that a lawyer who represents the child's legal interests, and

---

[29]     *K.M.G.*, 219 A.3d at 669.

[30]     *Id.* at 669.

[31]     *Id.* at 678 (Bender, P.J.E., dissenting).  Judge Bender's hedge here seems unwarranted.  If the Superior Court may not address the issue *sua sponte*, then neither may this Court.  The issue simply will go unreviewed.

[32]     *Id.* at 679 (Bender, P.J.E., dissenting).

who is directed by the child, is a necessity."[33]  "[O]ur General Assembly has decided that counsel for the child is required because of the primacy of children's welfare, the fundamental nature of the parent-child relationship and the permanency of termination."[34] "[W]here there is a conflict between the child's legal interests and [the child's] best interests, [a GAL] . . ., who advocates for a child's best interests, cannot simultaneously represent the child's legal interests."[35]  But "where a child's legal interests and best interests do not diverge in a termination proceeding, [a GAL] representing the child's best interests can also fulfill the role of the attorney appointed per Section 2313(a) to represent the child's legal interests."[36]  Determining whether a child's legal and best interests diverge requires the orphans' court to determine whether a child can express a preference and what that preference may be.[37]  If the child's wishes "cannot be ascertained, the GAL has no duty to 'advise the court' of such wishes," and the cross-appointment of one attorney to serve as GAL and legal counsel does not violate Section 2313(a).[38]

---

[33]   *In re L.B.M.*, 161 A.3d 172, 180 (Pa. 2017).  Although the lead opinion in *L.B.M.* did not command a majority of justices as to all of its parts, part II(A), in which this passage appears, was supported by a majority.  Hereinafter, citations to *L.B.M.* refer to those portions of the lead opinion that commanded a majority of justices except where I use "plurality" in the discussion or citation.

[34]   *Id.* at 183.

[35]   *T.S.*, 192 A.3d at 1082.

[36]   *Id.* at 1088.  *But see T.S.*, 192 A.3d at 1099-1105 (Wecht, J., dissenting), *infra* text accompanying nn. 74-75.

[37]   *See id.* at 1088.

[38]   *Id.* at 1089-90.

The right "belongs to the child, not the parent."[39]  When "[t]here was no attorney representing solely the children's legal interests who could have raised their rights in the [orphans'] court, . . . the children plainly could not have done so themselves."[40]  As the Superior Court highlighted in *K.J.H.*, a child's age and lack of representation render him or her incapable of identifying an orphans' court error, such as failing to appoint counsel.[41]  Thus, when a child's best and legal interests diverge, "the failure to appoint a separate attorney to represent the child's legal interests constitutes structural error."[42]  As structural error, and given a child's peculiar inability to monitor the regularity of his or her own legal proceedings, challenges to legal counsel's performance may not be waived for purposes of appeal.[43]  Thus, the Majority holds (and I agree) that the Superior Court should confirm *sua sponte* that Section 2313(a) counsel was appointed by the orphans' court.

Such is the current state of the law.  But the question that concerns me presently isn't the fact of *sua sponte* review but its scope.  The Majority restricts the scope of review to the vanishing point, leaving little more than a *pro forma* exercise, exposing children to precisely the risks of harm that appellate review should seek to eliminate.  The General

---

[39]     *Id.* at 1087.

[40]     *Id.* at 1087 (citing *K.J.H.*, 180 A.3d at 413 ("Child, due to his minority and lack of representation in the orphans' court, could not raise this issue himself.")).

[41]     *K.J.H.*, 180 A.3d at 413; *cf. In re T.M.L.M.*, 184 A.3d 585, 590 (Pa. Super. 2018), *overruled by K.M.G.*, *supra* ("Not only do children not have a say in the appointment of counsel, due to their minority, most children are not in a position to assess whether counsel has represented their interests effectively.").

[42]     *T.S.*, 192 A.3d at 1082.

[43]     *See* Maj. Op. at 22-23 (citing *L.B.M.*; *T.S.*; *supra*).

Assembly could not have intended to confer such a specific and important right to counsel only to insulate its fulfillment from appellate review.

In *L.B.M.*, we emphasized that: "The issue here is not whether or not the child's legal interests must be served (they must), but rather whether the General Assembly's mandate that counsel must be appointed for the child may be subverted or ignored (it may not)."[44] "[T]he recognized purpose of the statute is to ensure that the needs and welfare of the children involved are actively advanced."[45] Whether a child's legal interest was represented in a TPR proceeding is a distinct question from whether an attorney was appointed at all. There is no material difference between the failure to appoint counsel and the appointment of conflicted counsel. As Chief Justice Saylor commented separately in *L.B.M.*, because "the right to counsel in [the TPR] setting must be as scrupulously protected as the right to counsel in criminal cases," we should not "distinguish between a court's failure to appoint counsel and the appointment of conflicted counsel."[46] The Chief Justice further observed that, "where zealous representation is made impossible because of an attorney's duties as [GAL]—or, for that matter, any other reason—the court must refrain from making the appointment and should find a suitable [other] candidate."[47] In the face of this wisdom, the Majority here insists on limiting

---

[44]     *L.B.M.*, 161 A.3d at 180 n.12.

[45]     *Id.* at 180.

[46]     *Id.* at 184 n.2 (Saylor, C.J., concurring) (citing, *e.g.*, *Commonwealth v. Hawkins*, 787 A.2d 292, 297-98 (Pa. 2001)).

[47]     *Id.* at 184 (Saylor, C.J., concurring); *accord T.M.L.M.*, 184 A.3d at 590 ("[W]here a court appoints an attorney ostensibly as counsel, but the attorney never attempts to ascertain the client's position directly and advocates solely for the child's best interests,

appellate review to whether counsel was appointed at all—unless, fortuitously, someone other than the child happens to raise and argue the question. This leaves the right to *unconflicted* counsel in the hands of third parties and renders the child a passive witness, a muzzled observer to the vindication or sundering of the child's own wishes. In short, it leaves the right to chance.

The three mechanisms that the Superior Court cited as ensuring that a child's legal interests are heard and considered neither independently nor collectively can assure a child's statutory right to unconflicted legal counsel.[48] First, the intermediate court observes that, as noted, Pennsylvania Rule of Professional Conduct 1.7 requires an attorney to disclose any conflict, serving as a bulwark against counsel persisting in a cross-appointment capacity upon learning of a conflict between his or her obligations as GAL and legal counsel.[49] But as *amici curiae* the Juvenile Law Center and its learned colleagues observe, even if an attorney violates Rule 1.7 and the Office of Disciplinary Counsel brings an action against that attorney, such action "does not vindicate the rights of the client who had an attorney who acted unethically."[50] Aside from its deterrent value,

---

the child has been deprived impermissibly of his statutory right to counsel serving his legal interests.").

[48] *See K.M.G.*, 219 A.3d at 669.

[49] Although the rule is targeted at representation of two different clients, rendering its relevance to a GAL/Section 2313(a) conflict unclear, I assume—like the court below and others—that Rule 1.7 applies where a child's best interests (the GAL's concern) conflict with the child's legal interests (legal counsel's concern). *See T.S.*, 192 A.3d at 1098 n.6 (Donohue, J., concurring and dissenting); *L.B.M.*, 161 A.3d at 181 (plurality); *id.* at 187-88 (Baer, J., dissenting).

[50] Brief for Juvenile Law Center, *et al.*, at 6 n.4.

Rule 1.7 does nothing to enforce the General Assembly's command that a child's parent's rights not be terminated without considering the child's legal interests as determined and expressed by unconflicted legal counsel.[51]

Second, the Superior Court observed (correctly, as far as it goes) that any party may raise an alleged conflict before the orphans' court or Superior Court.[52] It is true that a parent whose rights are at stake may raise the conflict in the Superior Court, even without having preserved it in the orphans' court. But courts (and children) should not be forced to rely upon (unreliable) parents or other third parties to ensure that counsel's performance is scrutinized against Section 2313(a)'s child-focused mandate.

Third, the Superior Court opined that the "orphans' court . . . often decides this issue," ostensibly rendering *sua sponte* appellate review unnecessary.[53] But even if a child's right to counsel *often* is protected, the need remains to ensure the protection of that right in every case. Moreover, without an orphans' court record, appellate review, whether *sua sponte* or at a party's request, is a guessing game; entirely too much is left to chance. Conversely, *sua sponte* appellate review and, where necessary, remand to establish a record regarding counsel's efforts to discern child's wishes and the presence

---

[51] *Cf. L.B.M.*, 161 A.3d at 181 n.15 (plurality) ("Justice Baer suggests that the dependency GAL, bound by Pa.R.P.C. 1.7, could continue to represent the child in the TPR hearing because the dependency GAL would be required to seek appointment of counsel should there be a conflict of interest. . . . This essentially would make the GAL the arbiter of the child's right to counsel.").

[52] *See K.M.G.*, 219 A.3d at 669.

[53] *Id.*

or absence of conflict provides an alternative means of ensuring that cross-appointed counsel and the orphan's court fulfill Section 2313(a)'s mandate.

"Effective representation of a child requires, at a bare minimum, attempting to ascertain the client's position and advocating in a manner designed to effectuate that position."[54] When there is no evidence in the record to indicate that a child's counsel either "ascertain[ed] the client's position" or "advocat[ed] in a manner designed to effectuate that position,"[55] an appellate court cannot conclude that the orphans' court provided the child with counsel under Section 2313(a). Because a violation of Section 2313(a) is structural error, and is not subject to harmless error review, when faced with such an evidentiary void, the Superior Court should vacate the order terminating parental rights and remand the case to the orphans' court.

Under the Majority's approach, so long as a GAL is cross-appointed as legal counsel for the child and the court once asserts an absence of conflict, counsel can: (1) fail to interview the child; and (2) fail to meet with the child; and (3) fail to discern or express the child's wishes to the orphans' court; and (4) fail to confirm that his understanding of the child's wishes is up to date; and (5) tacitly invite the court to infer without a sound basis of record that he has confirmed that the child's legal interests and preferences are consistent with counsel's assessment of the child's best interests. If the court terminates the parent's rights having heard nothing to establish the child's wishes or to allow factoring them into the court's decision, and if neither parent nor any other interested party raises a conflict before the appellate court, the Superior Court must

---

[54] *In re K.R.*, 200 A.3d 969, 986 (Pa. Super. 2018).

[55] *Id.*

(under this approach) affirm. For me, Section 2313(a) evinces the legislature's clear intent that a child's right to legal counsel would never be so fragile, especially inasmuch as the right to appeal is of constitutional provenance.[56]

Even if the orphans' court has at some point in advance of the TPR hearing discerned some basis for the conclusion that there is no conflict—or, as the Majority does here, relies (unreliably) upon GAL's service in the GAL's different role during the preceding dependency case[57]—that determination may occur weeks or even many months before the TPR hearing. Such a preliminary determination does not alone establish that the child's interests coincide as the time of the hearing approaches. It may take time for the child to come to trust the attorney and speak openly about his or her preferred outcome. Or the child, for whatever reason—perhaps continuing visits with the parent further have informed the child's views—may change his or her mind between earlier consultations and the hearing.[58] Thus, as the hearing becomes imminent or at the

---

[56] *See* PA. CONST. art. V § 9 ("There shall be a right of appeal in all cases . . . from a court of record . . . to an appellate court, the selection of such court to be as provided by law . . . .").

[57] *See* Maj. Op. at 6 ("While the [Section 2313(a) appointment] order did not provide additional details regarding the court's finding of no conflict, we observe that . . . Hollenbeck had served as the Children's GAL [since 2016].]"); *cf. T.S.*, 192 A.3d at 1100 (Wecht, J., dissenting) ("When the lawyer acts in the dual capacity of GAL in dependency proceedings and legal counsel in the TPR hearing, role confusion is likely, particularly in circumstances where the child may direct counsel in the TPR hearing, but may not direct the GAL in the dependency proceeding.").

[58] *Cf. In re D.M.C.*, 192 A.3d 1207, 1211 (Pa. Super. 2018) ("While the record shows [the attorney] . . . briefly conferred with D.M.C., then just shy of 13 years old, as to his preferred outcome for permanency, we cannot discern from the record whether D.M.C. fully understood during the limited telephone call with [the] Attorney . . . that his adoption would mean . . . that his relationship with Mother would be legally and permanently severed.").

hearing itself, cross-appointed counsel should confirm on the record, by means appropriate to the case and the child's wishes, that no such conflict has developed. This is required to ensure: (a) that Section 2313(a) is satisfied; and (b) that the orphans' court pays due consideration to the bond between parent and child and child's preferred outcome; and (c) that those considerations are integrated into the court's analysis of Section 2511(b); and (d) that the record is sufficient to enable the appellate court meaningfully to review the orphans' court's decision.[59]

To be sure, counsel's timely assurances that no conflict is present must weigh heavily upon the trial court's evaluation of the evidence, and this evaluation is entitled to considerable deference.[60] But it is one thing to review an orphans' court's conclusion for

---

[59] Section 2313(a) is not the only Adoption Act provision that underscores the need to discern a child's preferences and factor those preferences, as well as considerations that may reveal a child's preferences such as the emotional connection between parent and child, into the determination of whether separation benefits the "developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b); *see In re J.R.R.*, 229 A.3d 8, 14 (Pa. Super. 2020) (remanding for consideration of the "Child's preferred outcome in this termination matter and the effect that termination would have on the Child"); *see also In re E.M.*, 620 A.2d 481, 485 (Pa. 1993) ("To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists and where the expert witness for the party seeking termination indicates that the factor has not been adequately studied, is not proper."). Justice Dougherty suggests that, because our courts have recognized that a child's "preferences and conflicting loyalties" do not always serve their "needs and welfare," *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013), and because we have folded questions of a child's emotional bond with a parent into the assessment of a child's "needs and welfare," the child's preferences and emotional bond with the parent somehow must be considered as discrete—if not antagonistic—factors. Conc. Op. at 5 (Dougherty, J., concurring). I disagree that the lines are so clear, and would describe this as one of the many case-specific considerations in TPR proceedings that militate in favor of more rigorous, rather than more deferential, appellate review.

[60] Although we have not considered what standard of review applies when appellate courts assess *sua sponte* the adequacy of legal counsel's representation under Section 2313(a), the appropriate standard would appear to be to review the orphans' court's consideration of adequacy (if any) for an abuse of discretion, a standard we apply

an abuse of discretion and to determine whether there is evidence *of record* to sustain the orphans' court's conclusion regarding cross-appointed counsel's absence of conflict. It is something else entirely to accept the court's reliance upon counsel's conclusory assurances.

By positing circumstances in which legal counsel's vigorous advocacy for a child's legal interests involve *not* divulging the child's preferences, the Majority biases its analysis against *sua sponte* review of cross-appointed counsel's potential conflict or categorical failure to advocate for child's legal interests. The Majority does this by simply knocking down the straw man of a "bright line" rule requiring the child's preference in this narrow sense be entered of record in all cases.[61] The Majority reserves *sua sponte* review for "bright-line" questions such as whether counsel was appointed in the first place. But on the Majority's account, whether a child's legal interests have been represented by cross-

---

in most facets of TPR proceedings. *See T.S.*, 192 A.3d at 1087 ("When reviewing an order granting or denying termination of parental rights, we accept factual findings and credibility determinations supported by the record, and we assess whether the common pleas court abused its discretion or committed an error of law."); *cf. In re S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) ("[E]ven where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the [orphans'] court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record . . . .").

[61] *See* Maj. Op. at 26 ("We . . . reject the argument that appellate courts should review *sua sponte* whether [cross-appointed counsel] sufficiently advocated for the child's interests by requiring the child's preferred outcome to be placed on the record."). Dissenting in *T.S.*, I also acknowledged that, under certain circumstances—there, where a child was too young to form a reliable preference as to outcome—legal counsel "must make use of whatever means are available and appropriate to make that assessment, including, but not limited to, observation of the child with the parents and foster parents and interviews of those involved in the child's case." *T.S.*, 192 A.3d at 1101 (Wecht, J., dissenting).

appointed legal counsel is too messy because it may not require—or may require *more* than—entry of the child's express preference regarding termination upon the record. If the question involved merely ascertaining the entry of the child's preference vis-à-vis termination upon the record, the inquiry would be as binary as whether legal counsel was appointed as such, and that would render it equally reviewable on the Majority's own account. According to the Majority, appellate courts should address it only when it is duly raised by a third party, but never on the appellate court's own initiative.

There is a more straightforward answer that best assures children receive the full benefit of the legal counsel that the legislature expressly intended. I agree with the Majority that the Court should be "wary to create a bright-line rule requiring counsel and the courts to place the children's preferred outcome on the record."[62] But no such universal rule is required to protect a child's right to counsel. Much as I posited in *T.S.* as to a child too young—or otherwise incapable—to formulate and articulate an outcome preference, counsel nonetheless can (and must) detail his or her efforts to glean the child's wishes, whether and to what extent those efforts succeeded, and that they confirmed no conflict,[63] thus making a record that enables appellate review. Putting the

---

[62] Maj. Op. at 27.

[63] Justice Dougherty suggests that what he describes as "assimilating consideration of the child's preferences within the grounds for involuntary termination . . . would reassign the burden for proving the grounds [for termination] are met from the party seeking termination . . . to a non-moving party whose duty is solely to the child." Conc. Op. at 5 (Dougherty, J., concurring). Not only does this appear to be a *non sequitur*, it also reinforces how important it is to confirm that cross-appointed counsel's conduct taken as a whole paid due regard to the necessary unity of purpose that defines any counsel's duty to a client. Of course legal counsel's "duty is solely to the child." *Id.* at 5. That is precisely why I would not leave the risk of conflict unexamined upon review when no other party sees any personal advantage in pressing the subject for his or her own purposes.

child's express, verbalized preference as such on the record is not the only way to establish that legal counsel has zealously represented the child's legal interests.[64] And it is zealous representation that the law requires.

Circling back to the *L.B.M.* formulation, the Majority also suggests that to require a more probing review would be tantamount to adding language to Section 2313(a). The Majority asserts that "Subsection 2313(a) simply does not require counsel to place the child's legal interests on the record," adding that "the statutory directive is to the court, not counsel."[65] "It is inappropriate," the Majority observes, to "engage in the judicial creation

---

[64] *Amici curiae* recognize that this context-sensitive approach is suitable to determine whether legal counsel understood and fulfilled its obligations without conflict. *See* Brief for Juvenile Law Center, *et al.*, at 11-12 n.6 ("*Sua sponte* review should ordinarily be very brief. It is only when the record . . , lacks any evidence that counsel has determined and articulated the child's desired outcome, that *sua sponte* review becomes necessary. . . . The court can establish limited inquiries and findings that demonstrate that a child has the benefit of counsel, which this Court has defined as 'a lawyer who represents the child's legal interests, and who is directed by child.' *L.B.M.*, 161 A.3d at 180. These inquiries can establish whether the attorney 'attempt[ed] to ascertain the client's position and advocate[d] in a manner designed to effectuate that position. *T.M.L.M.*, 184 A.3d at 590."). Mother, too, disclaims an overly intrusive scope of *sua sponte* review. *See* Brief for Mother at 30 ("Mother does not assert that *sua sponte* review of, for example, counsel's choice of litigation strategy is required or appropriate."). In this regard, Justice Dougherty acknowledges that "where a child's attorney adds little evidence to the record, it may not be possible to discern . . . how the attorney advanced the child's legal interests." Conc. Op. at 5. He also puts that rabbit in the hat by observing that "[a]n evidentiary hearing regarding the termination of a parent's rights will generally not adequately reflect how any party's counsel ascertained a client's position," *id.* at 3, disregarding the fact that attorneys and lower tribunals will perfect the record in whatever way we prescribe. We accept questions for review not to describe what the *status quo* is, but what it *should* be. And rather than suggest that the solution lies in counsel making a record, by whatever means suit the circumstance, Justice Dougherty would dispense with any such requirement so that establishing an evidentiary foundation for appellate review does not "controvert the focus of the proceeding." Conc. Op. at 5 (Dougherty, J., concurring). But requiring that counsel and the court provide a foundation for meaningful appellate review does not "controvert the focus of the proceeding"—it vouchsafes it.

[65] Maj. Op. at 27.

of what amounts to new statutory duties where we have repeatedly counseled" that the Court "must not 'add, by interpretation, a requirement not included by the General Assembly.'"[66] On this scaffolding, the Majority then cobbles together the conclusion that an appellate court cannot *sua sponte* consider whether any evidence at all demonstrates legal counsel's efforts to discern child's preference, or even that cross-appointed counsel *appreciated* the distinction between advocating for a child's best or legal interests— whether, in short, child received legal representation in more than name only. It is not to whom the directive applies that is important here—it is what the statute reveals about how the legislature intended to protect children.

Insofar as conflicted counsel is indistinguishable from no counsel at all, whether a child in a TPR proceeding had the benefit of unconflicted legal counsel becomes a central question in assessing the fulfillment of the General Assembly's intent. To provide an effective mechanism for reviewing that question on appeal even where no third party raises it does not superimpose some novel duty upon the indisputable right to counsel that Section 2313(a) creates. Rather, it gives meaning and effect to that right.

I recognize that courts in all contexts must depend upon the good faith and integrity of counsel. But where the potential injury is so grave and so thoroughly irreversible, and where the child whose best interests are paramount is so vulnerable, courts should do everything in their power to maximize the likelihood of a fair and just result. The legislature has determined that this requires the participation of zealous legal counsel dedicated to gleaning and giving voice to a child's own ideas and wishes. Implicit as a

---

[66] *Id.* (quoting *Kegerise v. Delgrande*, 183 A.3d 997, 1005 (Pa. 2018)).

matter of practical necessity is appellate review of counsel's satisfaction of the statutory mandate. Trust, but verify.[67]

My approach would not be more burdensome for the Superior Court in any given case than the Majority's approach. Already, the Superior Court must determine whether the orphans' court appointed counsel for the child.[68] The Superior Court also must review the conflict issue when it is raised.[69] It is unclear how the review required when the issue is raised by a third party differs from when the court raises it *sua sponte.* To be sure, it is always preferable to have party advocacy, but the value of advocacy runs in inverse proportion to the degree to which the inquiry involves the sufficiency of the record on a given point, especially where the appellate court asks not whether it would have reached the same conclusion, but rather whether the orphans' court had a sufficient evidentiary basis for reaching its own.[70]

---

[67] Although popularized by President Ronald Reagan, this phrase derives from a Russian proverb transliterated into English from Cyrillic as "doveryai no proveryai." *See* Barton Swaim, *'Trust, but verify': An untrustworthy political phrase*, WASH. POST, Mar. 11, 2016, *available at* washingtonpost.com/opinions/trust-but-verify-an-untrustworthy-political-phrase/2016/03/11/da32fb08-db3b-11e5-891a-4ed04f4213e8_story.html.

[68] *See K.J.H.*, 180 A.3d 411.

[69] *See, e.g.*, *K.R.*, 200 A.3d 969.

[70] Nor is it necessary to proceed without advocacy. Here, the Superior Court received supplemental briefing before rendering its decision. *See K.M.G.*, 219 A.3d at 666-67. That being said, the Superior Court in at least four cases has reviewed *sua sponte* whether a single individual could serve as GAL and counsel for a child without the benefit of supplemental briefing, and the sky has yet to fall. *See In re: Adoption of H.A.H.*, 2018 WL 4957398 (Pa. Super. Oct. 15, 2018) (unpublished); *D.M.C.*, 192 A.3d 1207; *M.D.Q.*, 192 A.3d 1201; *T.M.L.M.*, 184 A.3d 585. Finally, as Mother herself observes, were this Court to provide for meaningful *sua sponte* review as to whether Child had the benefit of unconflicted legal counsel, "future litigants would be prepared to address the issue in every termination appeal."

I would find that the Superior Court erred in this case. First, the orphans' court did not appoint separate attorneys to serve as GAL and counsel for Children. Second, at least three of the Children appear to have been old enough to express a preference as to the outcome of the proceedings. At the time of the TPR hearing, A.M.G. was eight years old, S.A.G. was six, K.M.G. five, and J.C.C. two.[71] Naturally, factors other than age may bear upon whether a child can express an informed preference, but other evidence in this case also indicated that these children were capable of voicing their legal interests. Six of the witnesses at the TPR hearing testified that Children had a bond with Mother, and the orphans' court credited this testimony.[72] Moreover, nothing in the record at the time of the TPR proceeding suggests that Hollenbeck had more recently investigated or disclosed Children's legal interests than at some point before the January 8, 2018 cross-appointment. In his closing presentation, Hollenbeck asserted only that he believed it was in Children's "*best interest* to grant [CYS'] Petition."[73]

Given the absence of any evidence, let alone any contemporaneous evidence, regarding Hollenbeck's efforts to identify Children's preferences and at least factor them into his assurance to the orphans' court that there was no risk of conflict between any of

---

[71] We observed in *T.S.* that "'children as young as five or six years of age'" may be able to express a preferred outcome in a TPR proceeding. *See* 192 A.3d at 1089 n.17; *accord K.R.*, 200 A.3d at 985; *M.D.Q.*, 192 A.3d at 1205; *T.M.L.M.*, 184 A.3d at 590. On the other hand, this Court has held that children who are two or three years old could "not have formed a subjective, articulable preference." *T.S.*, 192 A.3d at 1089. Based upon their age, the three older children could have expressed a preference. Even assuming J.C.C. was too young to express a legal interest, several witnesses indicated that Children wished to live together, and the court credited this testimony. *See* N.T. at 117, 156, 208.

[72] *See* N.T. at 80, 107, 117, 122, 156, 160, 179-80, 208; Orphans' Court Op. at 5-6.

[73] N.T. at 203 (emphasis added).

Children's best and legal interests, I would vacate all four orders. Even evaluating the orphans' court's decision most deferentially, and even assuming the very best of Hollenbeck, the appellate court simply cannot know upon what basis, if any, the orphan's court concluded that the legal interests of A.M.G., S.A.G., K.M.G., and J.C.C. had been represented, let alone zealously so, rendering meaningful appellate review impossible.

A final note. Although my analysis adheres to this Court's precedent in *T.S.*, today's case only reinforces my disagreement with that decision.[74] Section 2313(a) evinces the General Assembly's intent that separate counsel be appointed for a child in each contested TPR case, regardless of the child's age, ability to verbalize, or the possible convergence of best and legal interests. Had a majority of the Court shared my views, adhered faithfully to *LBM* in all respects, and simply followed the General Assembly's instructions, we would not now find ourselves hopelessly enmired in this morass, which this Court's own equivocations have created for us and for the lower courts. Counsel appointed with a unitary mandate proves a great deal more about his or her intention by showing up than does a cross-appointed attorney, whose mere presence may mask an underlying misunderstanding about, or conflict between, counsel's competing obligations.

As the Majority suggests, to impose a universal, *per se* rule that counsel must affirmatively and expressly enter a child's preference into the record might—at least at the margins—pose problems to the very attorney-client-type relationship we have indicated Section 2313(a) aims to provide. But the Majority's analysis in this case does

---

[74] *See L.B.M.*, 161 A.3d at 180-82 (plurality) (opining that Section 2313(a) entirely precludes cross-appointments of GALs to serve as legal counsel); *accord T.S.*, 192 A.3d at 1099-1105 (Wecht, J., dissenting) (same).

not rely upon matters so fine-grained. Whether the orphans' court issues an order confirming that there is no conflict a week before the TPR hearing or a year before it, the result is the same: Even if the evidence *indicates* a clear conflict—let alone where it supports no conclusion at all—relief on appeal will be available only if the conflict question is raised by someone other than the child on appeal. I find untenable the arbitrariness that will inevitably result from this new rule.

The Superior Court aptly has observed that the orphans' court's termination order is "a death sentence to the familial relationship."[75] Unwieldy though it may sometimes be, *sua sponte* review to assess the prospect of unrecognized or unacknowledged conflict, rather than the mere fact of a Section 2313(a) cross-appointment, is the only way to ensure that the General Assembly's directive in Section 2313(a) is followed.

Remanding for a more careful assessment might delay this case's and others' resolutions. But where counsel and the orphans' court have failed to make a record, concerns for delay cannot prevail over ensuring that children are not separated permanently from their parents without resort to the protections our General Assembly provided. Moreover, were this Court to proceed as I suggest, attorneys and orphans' courts would be on notice that such delay may be avoided simply by making a record sufficient to enable review. Better that we encourage that result than insist upon haste at the risk of mistake. We are dealing with something fundamental: the permanent severance of the relationship between a parent and a child.

The restrictions that the Majority imposes upon appellate review do not satisfy the mandate of Section 2313(a). The question of whether a child in a TPR proceeding has

---

[75]     *In re Lilley*, 719 A.2d 327, 329 (Pa. Super. 1998).

been afforded legal counsel who is unconflicted is too important to be judicially nullified by this Court or any other court.

Justice Donohue joins this concurring and dissenting opinion.