J-A06002-26
J-A06003-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.S.H., II, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 665 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 76 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF V.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 666 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 77 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF Z.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: H.J., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 667 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  78 of 2024

J-A06002-26
J-A06003-26

| | | |
|---|---|---|
| IN RE: ADOPTION OF Z.J.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 631 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 78 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF V.R.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 632 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  No. 77 of 2024

| | | |
|---|---|---|
| IN RE: ADOPTION OF J.S.H. III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.S.H., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 633 WDA 2025 |

Appeal from the Order Entered April 30, 2025
In the Court of Common Pleas of Westmoreland County Orphans' Court
at No(s):  76 of 2024

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

- 2 -

J-A06002-26
J-A06003-26

MEMORANDUM BY OLSON, J.:                    **FILED: April 24, 2026**

In these consolidated cases, H.J. ("Mother") and J.S.H. ("Father") (collectively, "Parents") have each appealed the April 30, 2025 orders that granted petitions filed by the Westmoreland County Children's Bureau ("WCCB" or "the Agency") and involuntarily terminated their parental rights to their biological son, J.S.H., II a/k/a J.S.H., III (born in March 2021)[1] and daughters, V.R.H. (born in September 2018) and Z.H. a/k/a Z.J.H. (born in September 2019) (collectively, "the Children").[2]  We affirm.

We discern the following factual and procedural history from the certified record.  At the time of Z.J.H.'s birth in 2019, Parents resided in the State of Oregon, where Z.J.H. was placed in the neonatal intensive care unit and later removed by Parents "against medical advice."  N.T., 12/19/24, at 13; Court Exhibit 1 at 3.  In addition, at a date unspecified in the record, Mother was found to be a perpetrator of child abuse and convicted of child neglect in Oregon in relation to another child not subject to these appeals.  ***See*** Court Exhibit 1 at 3; ***see also*** N.T., 12/19/25, at 14-15, 28, 40-41.

WCCB first became involved with this family in January 2022, upon the family's relocation to Pennsylvania, following a report alleging physical abuse

---

[1] In this memorandum, we refer to J.S.H., II, hereafter simply as J.S.H.

[2]  We have consolidated these cases *sua sponte* as Parents raise similar claims concerning the same factual and procedural events.  ***See*** Pa.R.A.P. 513.

- 3 -

of B.H., the Children's half-sibling through Father, by an adult household member.[3]  *See* N.T., 1/30/25, at 126; *see also id.* at 56.  The Agency ultimately learned that "the [C]hildren were not up-to-date medically." Agency Exhibit 7, Order of Adjudication and Disposition, 7/20/22, at 2.  Specifically, on March 10, 2022, the pediatrician diagnosed one-year-old J.S.H. with, *inter alia*, failure to thrive, hypotonia,[4] developmental delays of gross and fine motor function, as well as an "expressive" speech delay.  *See* Court Exhibit 1 at 4.  In addition, the back of J.S.H.'s head was flat,[5] and he "showed little response to verbal and physical contact."  *Id.*; *see also* N.T., 4/29/25, at 23.  Parents failed to have J.S.H. evaluated for services thereafter, as recommended by the pediatrician.  *See* Court Exhibit 1 at 4.  On March 24, 2022, upon recommendation of the pediatrician, J.S.H. was admitted to the hospital, at which time he was deemed a "near fatality."  *Id.* at 3-4; *see also* N.T., 4/29/25, at 23.  He was assessed to be "severely malnourished" and "underweight" and "presented with extreme global delays."  Court Exhibit 1 at 4.  The lower court aptly summarized:

> Entering Children's Hospital, [J.S.H.] had a weight of 15.1 pounds, which is well below the 3rd percentile of children at his age.  An

---

[3] The report concerning B.H., who is not a subject of the instant appeals, was eventually deemed unfounded.

[4] Hypotonia is "a diagnosis that relates to the children having weak muscle tone."  N.T., 1/30/25, at 8; *see also id.* at 142.

[5] J.S.H.'s flat head resulted from "being left on [his] back. . . . [The] sustained pressure creates the flat head for the child."  N.T., 4/29/25, at 23.

> MRI revealed brain volume loss, which was related to chronic malnutrition. . . . [Further, J.S.H.] was suffering from osteopenia, which is a thinning of the bones, and [his] motor development was that of a [newborn] child, rather than a 12-month[-]old child. . . . [T]he cause of these conditions was chronic neglect.

Agency Exhibit 7, Order of Adjudication and Disposition, 7/20/22, at 2. J.S.H. was also diagnosed with an abnormal chromosomal finding. ***See*** N.T., 1/30/25, at 8-9. Medical personnel, however, determined that his genetic disorder was not the cause of his failure to thrive because, upon receiving proper nutrition in the hospital, J.S.H. gained weight. ***See id.*** at 8-9, 85-90; ***see also*** Court Exhibit 1 at 3-4.

Likewise, two-year-old Z.J.H. was also found to be severely developmentally delayed, and she "could not stand up, was malnourished, and could barely speak." N.T., 1/30/25, at 56; N.T., 12/19/24, at 25-28; Agency Exhibit 8 at 18. She exhibited, *inter alia*, "gross motor delay and speech delay" requiring "intervention across all . . . domains[, including, but not limited to,] cognitive development." Court Exhibit 1 at 3; N.T., 12/19/24, at 27-28. Similarly to J.S.H., Z.J.H. had been diagnosed with hypotonia as well as the same genetic disorder. ***See*** N.T., 1/30/25, at 8-9. Upon evaluation of Z.J.H. following J.S.H.'s hospitalization, medical personnel had "high concern for neglect, and [observed] that the child's physical and developmental needs are not being met." Court Exhibit 1 at 3.

The Agency obtained emergency protective custody of J.S.H. and Z.J.H. on April 1, 2022. ***See*** N.T., 1/30/25, at 126. On April 14, 2022, the Agency

obtained emergency protective custody of V.R.H., then age three. ***See id.*** The record does not specify any medical concerns as to V.R.H. other than a hole in her heart. ***See*** N.T., 12/19/24, at 100. The Children were placed in foster care, where they remained at the time of the subject hearing.[6] ***See*** N.T., 4/29/25, at 25; N.T., 1/30/25, at 11, 142-43.

On July 20, 2022, the juvenile court found Parents to be perpetrators of abuse with respect to J.S.H, which this Court upheld on appeal. ***See Interest of J.H.***, 293 A.3d 619 (Pa. Super. 2022) (non-precedential decision) (Father's appeal); ***Interest of J.H.***, 293 A.3d 620 (Pa. Super. 2022) (non-precedential decision) (Mother's appeal). The juvenile court additionally adjudicated the Children dependent by stipulation and established their permanency goals as reunification along with concurrent goals of adoption. ***See*** Agency Exhibit 7. Parents contemporaneously faced criminal charges of endangering the welfare of children ("EWOC") related to J.S.H. and Z.J.H., which remained pending at the time of the subject proceedings. ***See*** Agency Exhibits 1 & 3.

The juvenile court ordered Parents to undergo mental health assessments, participate in parenting services, participate in offender's counseling, and participate in visitation with the Children at the discretion of the Agency. ***See*** Agency Exhibit 7. The court also directed Father to engage

---

[6] While not placed together throughout their dependencies, the Children were placed together at the time of the subject hearing. ***See*** N.T., 4/29/25, at 25; N.T., 1/30/25, at 11, 142-43.

in anger management. *See id.* Thereafter, in April 2023, the court found the existence of aggravated circumstances with respect to Parents but directed the Agency to make reasonable efforts toward reunification. *See id.*

The court held regular permanency review hearings from October 2022 through December 2024. During this time, Parents participated in services involving, *inter alia*, parenting education, offender's treatment, attachment therapy, mental health treatment,[7] as well as supervised visitation. *See* N.T., 1/30/25, at 127-33. While the court characterized Parents' compliance with their permanency objectives to be substantial, it found that Parents' overall progress towards reunification was minimal. *See generally* Agency Exhibit 7. Significantly, Parents' service providers consistently observed parenting deficiencies, *e.g.* their inability to understand and respond appropriately to the Children's developmental needs and their lack of protective capacity. *See* N.T., 1/30/25, at 25, 27, 66-67, 81, 144, 156; N.T., 12/19/24, at 32-33, 38. Moreover, Parents were unsuccessfully discharged from offender's treatment in August 2024, as a result of new criminal charges lodged against them involving EWOC and corruption of minors, *inter alia*. *See* N.T., 1/30/25, at 98-99, 112-13, 159-61; Agency Exhibit 11 at 6-8. These charges arose from

_____

[7] We note that Mother was diagnosed with depression, anxiety, and attention deficit hyperactivity disorder ("ADHD"). She was successfully discharged from treatment in January 2024, after a year of therapy. *See* N.T., 1/30/25, at 63, 67-68, 70-72, 74-75, 114-15. At that time, her depression, anxiety, and ADHD were "well-controlled." *Id.* at 115.

two minor non-biological children, H.B. and R.B., ages twelve and fifteen, who resided in Parents' home. The Agency received a report alleging, *inter alia*, that Father compelled R.B. to have sex with her boyfriend in a camper on the property. **See** Agency Exhibit **6** at 7; **see also** Agency Exhibit 11 at 8. Further, around the same time, WCCB learned that Parents were aware that the father of H.B. and R.B., who also resided in Parents' home, had expressed sexual thoughts about R.B. and failed to report it to authorities. **See** N.T., 1/30/25, at 99, 104. Dr. Richelle O'Malley, a certified therapist who provided offender's treatment to Parents, testified that this information "should have been reported immediately" by Parents as her services with Parents covered "what different types of abuse are" and "how you report that information." **Id.** at 100-01. She explained that Parents' failure to report this information posed a continuing safety risk to the Children. **See id**. at 103. Likewise, Dr. Christine Mahady, a licensed marriage and family therapist who performed an attachment assessment and provided attachment therapy to Parents, which she described as "interventions" aimed at "strengthen[ing] the emotional connection" between Parents and the Children, testified that she discontinued work with Parents at this time due to this "pattern of maltreatment towards children."[8] N.T., 12/19/24, at 89, 102, 105-09, 113, 119-20, 122-23.

---

[8] Dr. Mahady testified that she continued working with the Children and their foster parents. **See** N.T., 12/19/24, at 102, 110.

Thereafter, in December 2024, the court adjudicated A.H., Parents' fourth shared child, born in December 2023, dependent in part due to medical neglect.[9]  **See** Agency Exhibit 12 at 1-2.  Like her siblings, A.H. began exhibiting developmental delays, and, following a diagnosis of hypotonia, Parents failed to follow up as directed.  **See id.**; **see also** N.T., 1/30/25, at 91, 140-42.

On September 4, 2024, the Agency filed petitions to involuntary terminate the parental rights of Parents to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b).  At the time, the Children were three, nearly six, and nearly five years old, respectively.  The court held evidentiary hearings on the petitions on December 19, 2024, January 30, 2025, and April 29, 2025.  Mother and Father were each present and represented by separate counsel.  Likewise, the Children were represented by their guardian *ad litem* ("GAL"), Richard Baumgardner, Esquire.[10]

_____

[9] A.H. is not a subject of the instant appeals.

[10] Our Supreme Court has mandated that "appellate courts should engage in *sua sponte* review to determine if orphans'' courts have appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with" 23 Pa.C.S.A. § 2313(a).  **In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020).  Further, if the orphans' court appoints one attorney to represent both the child's best interests and legal interests, "appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict" prior to appointment.  **Id.**

*(Footnote Continued Next Page)*

On December 19, 2024, the Agency presented the testimony of Carol Hughes, a licensed psychologist who performed psychological assessments of Parents, as well as a best interests assessment; Dr. Mahady; and Shelly Weaver, a master's level clinician who provided to Parents offender's and non-offender's treatment.

On January 30, 2025, the Agency presented the testimony of Dr. Neil Rosenblum, a licensed clinical psychologist who performed separate interactional evaluations of the Children with Parents and their foster parents; Dr. O'Malley, who performed a comprehensive parenting assessment of Parents, individual treatment of Mother, as well as the aforementioned offender's treatment; and Jessica Sawich, the Agency caseworker since March 2024.

On April 20, 2025, the GAL presented the testimony of Carol Hughes, who had performed an additional assessment. The report of the court-appointed special advocate ("CASA"), Audia Otto, was admitted as Court Exhibit 1. *See* N.T., 4/29/25, at 58. The Notes of Testimony of Agency assessment caseworker Nadine Artman from December 13, 2024 in the underlying dependency proceeding were admitted, over Parents' objection, as

---

In this case, the orphans' court appointed the GAL to represent the Children after finding that no conflict existed between their legal and best interests. *See* N.T., 10/16/24, at 2. We conclude that the mandate of Section 2313(a) was satisfied by the court.

Agency Exhibit 6. *See* N.T., 12/19/24, at 5-7. The parties proffered and the court admitted numerous other documentary evidence, including Parents' criminal dockets, Children's collective dependency orders, and records from supervised visitation. *See* N.T., 4/29/25, at 53-57; N.T., 12/19/24, at 4-5.

By orders dated and entered on April 30, 2025, the orphans' court involuntarily terminated Parents' parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), (8), and (b). On May 22, 2025, Father timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which we consolidated *sua sponte*. On May 29, 2025, Mother timely filed separate notices of appeal, along with concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which we consolidated *sua sponte*. On July 8, 2025, the orphans' court filed a Rule 1925(a) opinion collectively addressing Parents' appeals.

On appeal, Parents each challenge the evidentiary support underlying the orphans' court's findings pursuant to Sections 2511(a)(2), (5), (8), and

(b) of the Adoption Act ("the Act").[11, 12]  ***See*** Mother's Brief at 15; Father's

Brief at 4-5.

> Our standard of review in this context is well-established:
>
> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence.  When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record.  Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

---

[11] We observe that the GAL did not file briefs in this Court on behalf of the Children.

[12] In the argument section of his brief, Father fails to divide his argument into parts in conjunction with the issues raised in his statement of questions involved.  ***See*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.").  Despite this organizational defect, we proceed with the merits of Father's appeal as we are able discern the issues raised on appeal which were addressed by the orphans' court in its Rule 1925(a) opinion.  ***See*** Pa.R.A.P. 2101 (stating, "Briefs . . . shall conform in all material respects with the requirements of these rules as nearly as the circumstances of the particular case will admit, otherwise they may be suppressed").  We caution counsel to comply with our appellate rules.

> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

Involuntary termination of parental rights is governed by Section 2511 of the Act, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *Id.* at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to Section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm termination. *See In re K.R.*, 200 A.3d 969, 979 (Pa. Super. 2018) (*en banc*).

We analyze the decrees involuntarily terminating Parents' parental rights to the Children pursuant to Section 2511(a)(2) and (b),[13] which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

_____

[13] Given our disposition relative to Section 2511(a)(2), we need not review and make no conclusions as to the orphans' court's findings with respect to Section 2511(a)(5) and (8). **See K.R.**, 200 A.3d at 979 (observing this Court may review one subsection of Section 2511(a) "[w]ithout considering the orphans' court's determinations" under any other subsection).

To prove the applicability of Section 2511(a)(2), the party petitioning for termination must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination pursuant to Section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (citation omitted). We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *Id.* (citation omitted).

Parents argue that the orphans' court abused its discretion in terminating their parental rights pursuant to Section 2511(a)(2) because they allege that they complied with their court-ordered services. *See* Mother's Brief at 30 ("Multiple service providers indicated that Mother was cooperative and compliant throughout the duration of the dependency case"); Father's Brief at 11-12 ("Here, Father has actively participated in all services offered by the Agency. The only thing standing in the way of reunification is his pending criminal charges. As soon as those are resolved, Father would be

able to complete offender['s] treatment, the only remaining barrier to reunification").[14] We must disagree.

The orphans' court found as follows with respect to Section 2511(a)(2):

At the time that the [C]hildren were removed from [P]arents' custody, WCCB had concerns related to [their] parenting [of] children with special needs. . . . At the time of the termination hearing, [P]arents continued to be participating in only supervised visitation and, indeed, had been charged with additional crimes related to their behavior in parenting roles with household members (which were not their biological children). It is clear to this [c]ourt that [P]arents cannot remedy their parenting for these three children in a timely manner. . . .

Orphans' Court Opinion, 7/8/25, at 6.

The record supports the termination of Parents' parental rights under Section 2511(a)(2). Specifically, the Children were subjected to severe medical neglect by Parents. As indicated, J.S.H. was admitted to the hospital as a "near fatality" and diagnosed with failure to thrive due to "severe[] malnourish[ment]" from "chronic neglect." Court Exhibit 1 at 4; Agency Exhibit 7, Order of Adjudication and Disposition, 7/20/22, at 2. He was

---

[14] To the extent Father additionally asserts a lack of reasonable efforts by WCCB due to his discharge from offender's treatment and attachment therapy, this argument is without merit. *See* Father's Brief at 15. When reviewing a termination decree on appeal, courts are not required to consider reasonable efforts provided to a parent. ***See In the Interest of: D.C.D.***, 105 A.3d 662, 672 (Pa. 2014) (although the Court recognized "the provision or absence of reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child[,]" it held that the provision of reasonable efforts is not a requirement for termination).

- 16 -

severely underweight and suffered brain volume loss, thinning of his bones, and motor development delays. Agency Exhibit 7, Order of Adjudication and Disposition, 7/20/22, at 2. While he was one year old, his development was equivalent to that of a newborn. **See** N.T., 4/29/25, at 22; **see also** Agency Exhibit 7, Order of Adjudication and Disposition, 7/20/22, at 2. Similarly, Z.J.H. had severe developmental delays but went without necessary services. **See** N.T., 4/29/25, at 23; N.T., 12/19/24, at 13, 25-28; **see also** Court Exhibit 1 at 3. At over two and one-half years old, she could not support her weight and could not walk. **See** N.T., 4/29/25, at 23. Parents never took accountability and acknowledged that the Children's conditions, in particular J.S.H., were caused by their failure to provide appropriate care and nutrition. Rather, Parents claimed these issues were caused by an underlying medical condition, as well as a lack of insurance. **See** N.T., 1/30/25, at 85-87; 145, 154, 159. However, these claims are belied by the fact that J.S.H. gained weight when he began receiving proper nutrition. **See id.** at 85-86, 90.

Moreover, Ms. Sawich testified that "various contracted providers have reported concerns in regard to [P]arents possibly being able to show that they have the appropriate parental capacities." **Id.** at 144. While acknowledging that Parents did achieve "some progress," Ms. Sawich averred that "there still are many concerns reported from the providers." **Id.** at 156. Ms. Sawich underscored the subsequent reports to WCCB and criminal charges as to the other children residing in Parents' home, which demonstrate a lack of parental

capacity. *See id.* at 144. As noted *supra*, Parents faced additional child welfare reports and/or criminal charges related to their youngest child, A.H., as well as the two non-biological children in their home, R.B. and H.B. Ms. Sawich testified this reflects a "pattern of not being able to fully understand their protective capacity role as the caregiver." *Id.* She further noted Parents' lack of accountability for the Children's condition. *See id.* at 145.

Similarly, both Drs. Rosenblum and O'Malley testified regarding Parents' parental incapacities. *See id.* at 25, 27, 66-68, 81. Dr. Rosenblum stated, "[B]ased on my observations of [P]arents' skills and their ability to understand and respond effectively to the [C]hildren's developmental needs, there were definitely limitations on their ability to focus effectively on the [C]hildren and securely respond to their needs." *Id.* at 27. Further, Ms. Hughes noted that Parents presented multiple risk factors for their continued abuse and neglect of the Children, due to their unstable mental health, criminal charges, domestic violence, and lack of accountability. *See* N.T., 12/19/24, at 32-33, 38.

Based upon the foregoing, we discern no abuse of discretion by the orphans' court in terminating Parents' parental rights pursuant to Section 2511(a)(2). The record unequivocally demonstrates that Parents' repeated and continued incapacities, abuse, neglect, and/or refusal have caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. Further, the conditions and

causes of Parents' incapacities, abuse, neglect, and/or refusal cannot or will not be remedied.

Since the record supports the orphans' court's conclusion that adequate grounds for termination existed pursuant to at least one subsection of Section 2511(a), we now turn to a review of the court's findings pursuant to Section 2511(b), which gives "primary consideration to the developmental, physical and emotional needs and welfare of the child."  23 Pa.C.S.A. § 2511(b); *see also T.S.M.*, 71 A.3d at 267.  Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis.  We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved.  Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability.  As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider.  The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.  And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

"The extent of any bond analysis . . . necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008) (citation omitted). However, our Supreme Court has concluded that "only a necessary and beneficial" parental bond should be maintained. *K.T.*, 296 A.3d at 1009. A bond is considered to be "necessary and beneficial" if its severance would cause "extreme emotional consequences or significant, irreparable harm." *Id.* at 1109-10.

Parents challenge the evidentiary support for terminating their parental rights pursuant to Section 2511(b). Mother, again, relies upon her compliance with her court-ordered services and argues that there was no evidence that termination favored the Children's developmental, physical, and emotional needs and welfare.[15] *See* Mother's Brief at 33-34. Father argues that the record does not demonstrate that the Children would not be irreparably harmed by severing his parental rights. *See* Father's Brief at 15.

In this case, the orphans' court found as follows with respect to Section 2511(b).

> It is noted for the record that [Parents] were founded perpetrators of physical abuse against J.S.H. for medical neglect by this [c]ourt, a decision which was upheld on appeal to the Superior Court. Additionally, WCCB presented evidence of how the [C]hildren have thrived since entering into placement in terms of

---

[15] To the extent Mother further challenges the orphans' court's findings regarding lack of parenting strategies and mental health coping strategies, we observe that these findings were made by the court in relation to Section 2511(a). *See* Mother's Brief at 34. As such, we will not address this aspect of Mother's argument further.

their overall development. Also, [Parents] currently face charges of [EWOC] for their alleged conduct regarding minor children that resided in their home as recently as July 2024. The [c]ourt cannot find any credible evidence to support the notion that the best interest of the [C]hildren would be served by maintaining the parental rights of Mother and Father. The [C]hildren are currently placed in a pre-adoptive foster home, which has demonstrated the ability to meet the special needs of the [C]hildren, including various speech, occupational and physical therapies for [J.S.H. and Z.L.H.], as well as [J.S.H.]'s medical fragility. [Parents] participated in none of these services and have not established any secure attachment to the [C]hildren. The best interest of the [C]hildren will be served by achieving permanency with a family that is able to fully understand the special needs of the [C]hildren and provide stability for their lives.

Orphans' Court Opinion, 7/8/25, at 6-7. This is supported by the certified record.

After three years of services, Parents never progressed past supervised visitation with the Children. *See* Parents' Exhibits A-E. Dr. Mahady reported that Z.J.H. and V.R.H. did not want to attend visits with Parents. *See* N.T., 12/19/24, at 98. Similarly, she recounted that J.S.H. "would . . . hang onto [the] foster [mother's] leg." *Id.* at 99. Dr. Mahady testified that the Children then began to exhibit "dysregulat[ion]," *i.e.*, breaking down in school, prior to visits with Parents in the fall of 2024. *Id.* at 99-100. As a result, Dr. Mahady determined visitation with Parents to be a grave threat to V.R.H., pending medical assessment, due to a hole in her heart. *See id.* at 100-01. Ms. Hughes testified that, as recently as March 2025, J.S.H. continued to resist separating from the foster mother at the commencement of visitation. *See* N.T., 4/29/25, at 33.

Ms. Sawich observed that the Children do not seek out contact with Parents during visitation. *See* N.T., 1/30/25, at 137-38. She testified, "[P]arents do seek out affection, you know, hugs and kisses . . . from the [C]hildren. . . . I do not observe the [C]hildren seeking out affection from [P]arents during the times that I visited them at the supervised visits." *Id.* at 137. This was confirmed by Dr. Mahady and Ms. Hughes, who each acknowledged insecure attachments between the Children and Parents. *See* N.T., 12/19/24, at 86-88; N.T., 4/29/25, at 17, 48-49. Ms. Hughes testified, "[Y]ou don't see the shared affect, you don't see the [C]hildren routinely approaching [P]arents, they're not routinely doing something to maintain proximity to [P]arents . . . ." N.T., 4/29/25, at 17. She further explained,

> [T]ypically when we see children with secure attachments, you see them wanting to have contact with the parent, that they're approaching the parent, you know, and they're establishing proximity and they're establishing interaction. . . . You'll see children looking at the parent for the affective response, you know, you tend to see the joy in sharing the activity. What we talk about is what's called shared attention, shared intention, shared affect.

*Id.* at 49.

Ms. Sawich testified that the Children seem "adjusted and comfortable" in their foster home. N.T., 1/30/25, at 143. She described the foster parents "as very nurturing to the [C]hildren, very attentive, whether it be through physical affection or verbal, the [C]hildren . . . are always . . . wanting a hug or a snuggle. They do seek that out from the foster parents." *Id.* at 141.

Indeed, Dr. Mahady testified that the Children were "building" an attachment with their foster parents. N.T., 12/19/24, at 110. Likewise, Dr. Rosenblum observed evidence of a growing attachment. *See* N.T., 1/30/25, at 10-11, 17, 32-33. He testified that the Children relate "extremely well" to their foster parents and refer to them as "mom and dad." *Id.* at 10-11. He further explained that the Children's "attachments to [their] foster parents are growing stronger all the time because these are the people who day in and day out are providing the care, the nurturance, the consistency, and the support. This is their primary family environment." *Id.* at 33.

With her recent observations from March and April 2025, Ms. Hughes observed J.S.H. to be a "chatter box" in the foster home. N.T., 4/29/25, at 7; *see also id.* at 18-19, 40. In contrast, Ms. Hughes testified that J.S.H. is "selectively mute" in the presence of Parents, which she testified is an "anxiety response" in which "there's something about the environment that's triggering the child, triggering anxiety, and so the response to that is to selectively not talk. It can also be related to post-traumatic stress disorder." *Id.* at 7-8; *see also id.* at 25, 38. Ms. Hughes further characterized Z.J.H. and V.R.H. as "bright" and "happy" and "delightful" to engage with while with their foster parents, whereas they presented as "subdued" during visitation with Parents. *Id.* at 10, 19-20. Notably, Ms. Hughes testified that V.R.H., then six years old, expressed her desire to live with her foster parents. *See id.* at 46.

Ms. Sawich testified that the Children are "up-to-date medically" and "doing well." N.T., 1/30/25, at 138-39. She reported that J.S.H. and Z.J.H. completed physical, occupational, and speech therapies. *See id.* According to Ms. Sawich, J.S.H. attends preschool and is "on target" to enter kindergarten. *Id.* at 138. In addition, Z.J.H. successfully attends school and her gross motor skills are "developed to the appropriate age and stage." *Id.* at 140. Indeed, Dr. Rosenblum observed that the Children "receive appropriate attention and their "developmental needs are being met." *Id.* at 18. Similarly, Ms. Hughes described the Children as "thriving." N.T., 4/29/25, at 24.

Emphasizing the Children's need for permanency, Ms. Sawich testified that "the [C]hildren . . . should remain in the foster home where they feel secure. They do feel that that's their home." N.T., 1/30/25, at 158-59. This was echoed Ms. Hughes. *See* N.T., 4/29/25, at 27. Ms. Hughes explained, "that's the outcome that's going to provide them [with] the opportunity for their emotional growth, their physical growth, and for them to continue to show progress in their adjustment." *Id.* at 26. She continued, "if [P]arents are not going to demonstrate the ability to parent [the C]hildren effectively [and] support their growth and development, . . . there needs to be permanency and stability. . . . [W]e need to be developmentally respectful to the [C]hildren at this point in time." *Id.* at 27.

Thus, the record amply demonstrates that the Children do not share a necessary and beneficial bond with Parents. *See K.T.*, 296 A.3d at 1109-10, 1113. While Parents may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citation omitted). Based upon our review of the record, we discern no abuse of discretion in the court's conclusion that the Children's developmental, physical, and emotional needs and welfare will be served by the termination of Parents' parental rights pursuant to Section 2511(b).

Accordingly, we affirm the orders.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 4/24/2026